Judgment accordingly.(<em>a</em>)

[KINGS GENERAL TERM, October 6, 1851. *McCoun, Morse* and *Barculo,* Justices.]

(*a*) Affirmed in court of appeals.

---

THE PEOPLE *ex rel.* the Roman Catholic Orphan Asylum Society in the city of Brooklyn, *vs.* THE BOARD OF EDUCATION OF THE CITY OF BROOKLYN.

The act of March 7, 1848, which declares that " the orphan asylum societies of the city of Brooklyn shall participate in the distribution of the school moneys *raised in said city,* in proportion to the number of children between the ages of four and sixteen who have been under the charge of said societies during the past year, and instructed in such manner as is usual in common schools; and shall hereafter be annually entitled to such distributive share, in the same manner and to the same extent as is now or shall be provided in respect to the common schools of said city," did not intend to bestow upon the asylum societies a share of the moneys arising from the revenues of *the common school fund.* BROWN, J. dissented.

The People *v.* Board of Education of Brooklyn.

If such were the design of the statute it would be in conflict with the 9th article of the constitution, which provides that the capital of the common school fund shall be inviolate, and that the revenue thereof shall be applied to the support of *common schools.*

The operation of the statute is confined to that portion of the moneys which is raised for the support of schools by tax upon the property of the city of Brooklyn.

The schools maintained by the Roman Catholic Orphan Asylum Society of the city of Brooklyn are not " common schools" within the meaning of the constitution.

THIS was an appeal by the defendants from an order made at a special term of the court, directing a peremptory mandamus to issue. The alternative writ recited that the relator, the Roman Catholic Orphan Asylum Society in the city of Brooklyn, had under its charge, and instructed in such manner as was usual in common schools, an average number of 125 children, between the ages of 4 and 16 years of age, for and during the year 1847; that during that year, the Brooklyn Orphan Asylum Society, (being the only other orphan asylum society in said city,) had also under its charge, and instructed in such manner as was usual in common schools, an average number of 80 children, between the ages of 4 and 16 years of age; the defendants, the Board of Education of said city, on the 7th day of March, 1848, had for distribution, among the common schools, and orphan asylum societies in the said city of Brooklyn, in pursuance of the several laws relating to common schools in the said city of Brooklyn, and of chapter 76 of the laws of 1848, the sum of $26,149,50, being the whole amount of common school moneys raised in said city, for the year 1848; that such distribution was apportioned and made by them in that year, among the several common schools in said city, on the basis of the average attendance of scholars in said several common schools, for the previous year, which average attendance in the said common schools, for said year, was 3247 children; that the said Roman Catholic Orphan Asylum Society, under and by virtue of the said acts of the legislature, were justly entitled to participate in the distribution of the said school moneys raised in said city, in proportion to the number of children, who had been under the charge of the said

society in their schools, and instructed therein, in such manner as was usual in common schools, and was entitled to such distributive share, in the same manner and to the same extent, as that provided in respect to the common schools in said city; that the said Roman Catholic Orphan Asylum Society, under and by virtue of the said laws, was justly entitled to the sum of $946, as its distributive share of the moneys so had for distribution, for the year 1848; that the said Roman Catholic Orphan Asylum Society had also, for and during the year 1848, an average attendance of 200 children, between the ages of 4 and 16 years of age, under their charge, and educated in their schools, and instructed as aforesaid, and the said Brooklyn Orphan Asylum Society, (the only other orphan asylum society in the said city of Brooklyn,) during the year 1848, had also an average attendance of 80 children under its charge, of like age, and instructed by said society in like manner; that the said Board of Education had a sum of $31,657, in the said year 1849, being the school moneys raised for that year, in said city, for distribution among the said several common schools, and orphan asylum societies in said city, under and in pursuance of the said laws, and that the defendants apportioned and made distribution of said money among said common schools, upon the basis of the average attendance of scholars in the said several common schools, for and during the year 1848, which average attendance in said common schools, for the year 1848, was 3763 children; that the said Roman Catholic Orphan Asylum Society was justly entitled to the sum of $1564, as its distributive share of said moneys, so had for distribution for the year 1849, under and by virtue of the several laws aforesaid; that the said Roman Catholic Orphan Asylum Society, for and during the year 1849 had an average attendance of 250 children between the ages of 4 and 16 years of age under the charge of, and instructed by, the said society, in the manner aforesaid, and for the same period the average attendance of children of like age under the charge of the said Brooklyn Orphan Asylum Society, (the only other orphan asylum society in said city of Brooklyn,) and instructed in like manner as aforesaid was 90 children; that the said Board of

The People *v.* Board of Education of Brooklyn.

Education had the sum of $32,307,17, in the year 1850, of school moneys raised in said city, for that year for distribution among the said several common schools and orphan asylums in said city, under and in pursuance of said laws, and of chapter 261 of laws of 1850, and made distribution of said moneys among said common schools, upon the basis of the average attendance of children in the said several common schools in said city, for the year 1849, and that such average attendance in such common schools, for and during the year 1849, was 4326 children; that the said Roman Catholic Orphan Asylum Society was justly entitled to the sum of $1730 as its distributive share of the said moneys so held for distribution for the year 1850; that any omission of the said Roman Catholic Orphan Asylum Society to make report of the number of children under its charge and instructed by said society; or to make application in due time to the Board of Education, for the share of school moneys to which the said Roman Catholic Orphan Asylum Society was entitled for the year 1848 and 1849, was satisfactorily explained to, and excused by the superintendent of common schools.   That nevertheless the defendants had unjustly refused, and did refuse, to pay to the said Roman Catholic Orphan Asylum Society, the said several sums before mentioned, to which the said society was justly entitled as aforesaid, or any or either of them, to the grievous damage of the said Roman Catholic Orphan Asylum Society.   The writ then commanded the defendants to pay to the relators the sum of $4240, being the whole amount of the said several sums before mentioned, or that they show cause to the contrary, and why a peremptory mandamus should not issue. To this writ the defendants made a return, in which they alledged and insisted that the relators were not entitled to be allowed, and paid out of the school fund distributable by the Board of Education for the year 1850, the moneys claimed by them; that the said Roman Catholic Orphan Asylum Society were not entitled to be allowed, and paid out of the said fund, the moneys which they claimed to have been entitled to out of the common school fund distributed in the years 1848 and 1849; that no report or communication whatever had been made by the relators

to the Board of Education, in relation to the number of children, orphans or others, which had been under their charge, or of the manner in which such children were instructed, except certain communications of which copies were annexed marked A., B., C. and D. ; which communications were the only report or information communicated by the said Asylum Society to the Board, in relation either to the children under the charge of the said Asylum Society, or the manner in which they had been instructed, or the number or qualification of the teachers, or the time when the certificate of qualification of their teachers was dated or obtained, or the time a school had been kept, or otherwise howsoever, in relation to the management of the school or schools of said asylum, before the issuing of the said alternative writ of mandamus ; and they insisted that the said reports did not entitle the said Asylum Society to the moneys claimed by them ; that the said papers marked A., B. and C. were never formally communicated to them, but were delivered to the city superintendent, who placed them among the files of the Board, and that said paper, of which a copy is marked A., was delivered to said city superintendent sometime in the spring of the year 1850 ; that said paper, of which a copy is marked B., was delivered to said superintendent about the time of its date, and that said paper of which a copy is marked C., was delivered to the said superintendent late in the month of May, or early in the month of June, 1850 ; and that said paper, of which a copy is marked D., was delivered to the Board about the time of its date ; that the moneys held by the said Board for distribution in the year 1848, amounted in the aggregate to the sum of $26,049,50; of which sum $6286,35 was received from the state—an equal sum was received from the county school tax of Kings county—and the residue was received from the school moneys raised in the city of Brooklyn. That the moneys held by the said board for distribution in the year 1849, amounted in the aggregate to the sum of $30,657,03, of which sum $6518,96 was received from the state—an equal sum was received from the county school tax of Kings county—and the residue was received from school moneys raised in the city of Brooklyn. That the moneys held

by the said Board for distribution in the year 1850, amounted in the aggregate to the sum of $34,914,75, of which sum $6518,96 was received from the state—$6751,67 was received from the county school tax of Kings county—and the residue was received from school moneys raised in the city of Brooklyn; that the number of children who were instructed in the public schools of the said city in the years 1847, 1848 and 1849, were as follows, viz. in the year 1847, 10,228; in the year 1848, 11,809; and in the year 1849, 12,987; that an apportionment of the school money distributable by them was made in the year 1848, on the 7th day of March in that year; in the year 1849, on the 2d day of January in that year; and in the year 1850, on the 5th day of March in that year; and that the said moneys so apportioned in the years 1848 and 1849, had all been expended, and that the said money apportioned in the year 1850 had been apportioned, and a considerable portion of it expended, before the receipt of either of the communications or reports above referred to; that they had no knowledge and no information except as communicated as aforesaid by the said Asylum Society, that any of the children under the charge of, and instructed by, the said society were orphans, or were, or were alledged to have been, instructed in a manner to entitle the said Society to a share of the school moneys to be distributed by the Board, or that the said Society made, or intended to make any claim to any share of the said school moneys; and that the Board did not and does not know, and had and has no certain and reliable means of ascertaining, how many of the children alledged to have been instructed in the schools of the said Society in the year 1848, or in the year 1849, or in the year 1850, were orphans; that, as they believed and insisted only a small proportion—but precisely what proportion they were unable to state—of the children alledged in the said alternative mandamus to have been instructed in the schools of said Society in the year 1848, 1849 and 1850 were orphans, if any of those children were orphans, of which they had no knowledge or positive evidence; and that they could not admit, but they denied, that said Society had caused to be instructed the number of children, orphans or not orphans, alledged in said alter-

native mandamus ; that the said Asylum Society did not in either of the said years 1848, 1849 and 1850, make due and timely application for the sums claimed by them, out of the school moneys distributable by the Board in the said years, and that their omission to make such application had never been excused by any lawful and competent authority, so as to entitle them to receive the sums so claimed, or any of them ; that an order was made by the state superintendent of common schools, (without notice, however, to the Board of any application therefor,) of which a copy was annexed, marked E., and was served upon the Board shortly after its date, but that they had no knowledge or information of any applications by the said Asylum Society, to the state superintendent, to be excused for their omission to make the report in the said order referred to, or to make applications for the moneys which they claimed they would have been entitled to, out of the common school fund, distributed in the years 1848 and 1849, had due application been made therefor, in the said years, and they did not believe that any such application was made by them ; that no notice whatever was given to the Board of Education, of such application, if any were in fact made, and they insisted that the said order of the superintendent, and which was the only order made by him in relation to said omissions, was wholly unauthorized, and was void and of no effect, and did not excuse such omission ; that the defendants had no knowledge of the number of orphans or other children under the care and charge of the said Asylum Society, who had been instructed in the schools of the said society, except what they derived from the said papers, of which copies were annexed, marked A., B. and C. ; and they insisted that if the said Asylum Society was entitled to any portion of the said school moneys, for the said years 1848, 1849 and 1850, they were so entitled only upon the basis of, and with reference to, the orphan children, taught in the schools of said Asylum Society, and that the numbers of children so taught, in said schools, did not, in the years 1847, 1848 and 1849, exceed the numbers specified in said papers ; that a committee was appointed by the Board to investigate and report upon the claim made by the said society to a share

The People *v.* Board of Education of Brooklyn.

of the public school moneys, which committee, on the 2d day of July, 1850, made a report upon the matter so referred; and that the said Board were about to proceed and determine what share of the said school moneys, if any, the said society was entitled to receive, when all further action of the Board on the subject was arrested by an injunction order, obtained in the supreme court in the first judicial district, by the Brooklyn Orphan Asylum Society, and a similar injunction order obtained in said court, by the said Catholic Asylum Society, restraining the Board from proceeding further in the distribution of the common school moneys which, by law, were subject to their control; one of which said orders was served on or about the 22d day of July, 1850, and both of which orders remained in full force, as to the sums claimed by the said societies, respectively; that during each of the years 1847, 1848 and 1849, all the orphan and other children, instructed in the schools alledged to be conducted by the said Catholic Asylum Society, were instructed in such schools in the religious sectarian tenets and doctrines taught in the Roman Catholic Church, and that by reason of such sectarian teaching, the said Asylum Society had disentitled itself to share in the school moneys distributed by the Board, for the years 1848, 1849 and 1850. That the said Board of Education, by reason of the matters above alledged, had not made distribution to the said Asylum Society, in conformity with their said claim, and they insisted that they should not be required to make such distribution.

To this return the relators demurred; assigning several causes of demurrer, and the defendants joined in demurrer. The parties stipulated that the following issues of law, arising upon the writ and return should be argued before Justice Brown at a special term, and that his decision thereon should be incorporated in the order or judgment pronounced by him on the argument of the demurrer to the said return, viz.: 1. Whether the Roman Catholic Orphan Asylum Society is to have the distributive share of school moneys claimed by it, out of the school moneys raised in the city of Brooklyn, or out of the city, county and state school moneys, or which of them? 2. Whether the ba-

sis of the distribution must be the orphan children on one side, and the average or aggregate number of children attending the public schools, on the other? 3. For what years must the distribution be made to the Orphan Asylum Society?

The cause having been heard on the said issues, the court made an order, adjudging that the relators were entitled to take such a proportion of the school moneys as would be equal to the proportion which the average number of orphan children, between the ages of 4 and 16 years, under their charge, and instructed by them during the year preceding the time or times of the distribution, bore to the average number of children between the ages of 4 and 16, who had attended the other common schools of the city, during the same period of time, added to the number of children, upon which the orphan asylum societies were entitled to a distributive share of such moneys. And judgment was given for the relators; that a peremptory writ of *mandamus* issue commanding the defendants to pay over to the relators their share of the school moneys—the amounts to be ascertained by a reference to the pleadings, and in conformity with the principles stated in the opinion of the court.

*J. M. Van Cott*, for the appellants.

*S. B. Brophy*, for the relators.

BARCULO, J. I have no doubt of the propriety of affirming the judgment rendered at the special term, except so far as it gives to the relators that portion of the school moneys which is received from the revenues of the common school fund. In that respect I consider the decision erroneous, for the following reasons.

The constitution, article 9, provides that the capital of the common school fund shall be inviolate; and the revenue thereof shall be applied to the support of common schools. The act of March 7, 1848, (*Laws of* 1848, *p.* 85,) under which the relators claim, declares that "the orphan asylum societies of the city of Brooklyn shall participate in the distribution of the school moneys raised in said city, in proportion to the number of chil-

dren between the ages of four and sixteen, who have been under the charge of said societies during the past year, and instructed in such manner as is usual in common schools; and shall hereafter be annually entitled to such distributive share, in the same manner and to the same extent as is now or shall be provided in respect to the common schools of said city."

Two questions now arise; *first*, whether this act intends to bestow a share of the public moneys arising from the state fund; and secondly, if such be its design, whether it is not inconsistent with the above article of the constitution.

1. As to the first inquiry, if we follow the safe and wholesome rule of adopting the restricted construction of a statute, when the more liberal one will bring us in conflict with the fundamental law, we will at once conclude that the act was not designed to reach the fund in question. Nor is there any reason for a more enlarged interpretation. The language restricts the right to a share of the moneys *raised in said city*. And it has full operation, without being applied to the common school fund, upon that portion of the moneys raised for the support of schools by tax upon the property of the city. The terms of the statute are therefore complied with, by this construction, without invading the fund made sacred by the constitution.

2. But if the act of 1848, by a fair construction of its terms includes the revenues of the common school fund, then the statute encounters the constitution. For the school of the relators cannot by any reasonable definition be made to fall within the constitutional meaning of the term "common schools."

Let us look into the statutes and see what kind of a school they are authorized to keep. The society was incorporated by the act of May 6, 1834, which gives it power to prescribe rules and regulations for the admission of members, and for expelling them for the non-observance of its laws; and its objects are declared to be "the purpose of relieving the poor, and of protecting and educating orphan children." The act of December 15, 1847, section 2 declares that "every such asylum may make all laws, rules and regulations *relative to the education* and discipline of their inmates, as a majority of the trustees thereof at their

annual meeting shall think fit and proper; but such laws, rules and regulations shall not be repugnant to the laws of this state in its policy in reference to public and primary instruction, and shall be subject at all times to the inspection and supervision of the several educational officers of the different villages, towns or cities in which such orphan asylums may be located."

From these provisions we are enabled to perceive, that this mode of education essentially differs from our common school system, in several particulars. In the first place it is confined to orphans, and of these the trustees of the asylum have the power to admit or reject applicants according to their pleasure. They may adopt a standard of membership which will admit all of a certain faith or age and exclude all others. In fact they can determine absolutely who shall be the *inmates.* Moreover they are not compelled to keep any school at all. All that is required of them is that in case they do make laws and regulations relative to the education of the inmates, whom they have selected, they shall not make such laws repugnant to the policy of the state on the subject of public and primary instruction.

A "common school," as recognized by our laws and constitution, is quite a different affair. Our common schools are not confined to any *class,* but are open *to all;* the trustees have no power to admit or reject pupils arbitrarily; they have no authority to make rules and regulations fixing a standard of admission for members. They are bound to instruct all the children who present themselves, without regard to their social relations, their station in life or their religious faith. The spirit of our institutions on this point was embodied in the first section of the act of 1849, which declared that "common schools shall be free to all persons residing in the district over five and under twenty-one years of age." The word "common," as applied to our schools, bears the broadest and most comprehensive signification. It is equivalent to *public, universal, open to all;* for such is their character, subject only to such general statutory regulations as are prescribed by the legislature. They are common to all children, in the sense that public highways are common to all persons who may choose to ride or drive thereon,

The People *v.* Board of Education of Brooklyn.

observing only the law of the road. Thus have they been treated by the legislature in the various enactments on the subject. They have always been kept distinct from academies, colleges and private seminaries of learning ; and especially have they been kept, and ought they to be kept free from every thing savoring of sectarian influence or control. If we are to sustain such a claim as this, on behalf of a Roman Catholic Asylum to-day, we shall probably be called on to-morrow, to do the same for half a dozen Protestant denominations, who may desire to propagate their own peculiar views at the public expense. We do not intend to speak disparagingly of these institutions. In their proper sphere they are worthy of all praise and all legitimate support. But we are unable to discover any good reasons why the children supported and protected by these asylums, cannot attend the ordinary public schools of their district. If the object of this special legislation is to afford them such education as the state furnishes to all, it may as well, and better, be obtained through the ordinary channel. If the object is to furnish them with instruction of a partial or sectarian character, the state ought not, and cannot constitutionally, contribute to such a purpose.

To say that the legislature can determine what institutions shall receive the proceeds of the school fund ; and that whatever they determine to be entitled thereto, becomes *ipso facto* a common school, is begging the whole question, and annulling the constitutional restriction. For if this were so, they might by a simple enactment, convert all our colleges and academies and all other seminaries into common schools. This cannot be tolerated. The courts must interfere, and preserve the constitution. All experience shows that the legislature will not.

The judgment is therefore reversed, so far as it relates to the moneys received from the common school fund, and affirmed as to the residue.

MORSE, J. concurred.          BROWN, J. dissented.

Judgment accordingly.

[KINGS GENERAL TERM, October 6, 1851. *Morse, Barculo* and *Brown*, Justices.]