Glenn L. Judd et al., Appellants, *v.* Board of Education of Union Free School District No. 2 of the Town of Hempstead et al., Respondents.

John J. Bennett, Jr., as Attorney-General of the State of New York et al., Respondents.

Argued March 9, 1938; decided May 24, 1938.

*Joseph Wheless* for appellants. The Constitution prohibits State aid directly or indirectly to religious schools. (*People ex rel. Lewis* v. *Graves,* 245 N. Y. 195; *Lewis* v. *Bd. of Education,* 258 N. Y. 117; *Gunnison* v. *Bd. of Education,* 176 N. Y. 11; *Adamson* v. *Union R. R. Co.,* 74 Hun. 3; *Smith* v. *Donahue,* 202 App. Div. 656.) The Constitution prohibits State aid, directly or indirectly

to sectarian schools. (*People ex rel. Roman Catholic Orphan Asylum* v. *Board of Education*, 13 Barb. 400; *Smith* v. *Donahue*, 202 App. Div. 656; *O'Connor* v. *Hendrick*, 109 App. Div. 361; 184 N. Y. 421; *Stein* v. *Brown*, 125 Misc. Rep. 692; *State ex rel.* v. *Milquet*, 180 Wis. 109; *People ex rel. Lewis* v. *Graves*, 245 N. Y. 195.)

*Stephen Crane West* for defendants, respondents. The statute is valid. (*People ex rel. Lewis* v. *Graves*, 245 N. Y. 195; *Smith* v. *Donahue*, 202 App. Div. 656; *Pierce* v. *Society of Sisters*, 268 U. S. 510; *Cochran* v. *Board of Education*, 281 U. S. 370.)

*John J. Bennett, Jr., Attorney-General* (*John F. X. McGohey, Henry Epstein* and *John C. Crary* of counsel), intervener, respondent, Furnishing the same transportation for pupils who obtain the education required by law at parochial schools as is provided for the pupils of public schools, is not aiding or maintaining denominational schools. It is an aid to all school children separate and apart from the institutions which they attend, and is, therefore, not in violation of section 4 of article 9 of the State Constitution. (*Johnson* v. *City of New York*, 274 N. Y. 411; *Schieffelin* v. *Goldsmith*, 253 N. Y. 243; *People ex rel. Nash* v. *Loughman*, 220 App. Div. 549; *Matter of People* v. *Title & Mortgage Guar. Co.*, 264 N. Y. 69; *People ex rel. Lewis* v. *Graves*, 245 N. Y. 195; *Pierce* v. *Society of Sisters*, 268 U. S. 510; *Meyer* v. *Nebraska*, 262 U. S. 390; *Cochran* v. *Louisiana State Board of Education*, 281 U. S. 370; *Lewis* v. *Board of Education*, N. Y. L. J. Feb. 19, 1937.)

*Thomas F. Hyland* for Frederick B. Bertrand, Jr., et al., interveners, respondents. The State Constitution does not forbid the furnishing of equal transportation to all school children at public expense. (*Lewis* v. *Board of Education*, N. Y. L. J. Feb. 19, 1937; *Pierce* v. *Society of Sisters*, 268 U. S. 510; *Borden* v. *State Board of Education*, 168 La. 1005; *Cochran* v. *Louisiana State Board of Education*, 281 U. S. 370.)

RIPPEY, J. This action is brought by citizens of the United States and of the State of New York, each a resident and a taxpayer within the geographical limits of Union Free School District No. 2, of the Town of Hempstead, Nassau county, and owning property of the value of an amount in excess of one thousand dollars, to restrain the Board of Education of that school district from furnishing transportation with public funds for pupils to and from any private or parochial school located within or without such district, to compel the cancellation and removal of the assessment, levy and lien on their property for moneys appropriated for that purpose, and for other relief.

The defendant school district is a municipal corporation (General Corporation Law [Cons. Laws, ch. 23], § 3; Laws of 1892, ch. 687) and the defendant Board of Education is a body corporate (Education Law [Cons. Laws, ch. 16], § 300). An action may be brought by a taxpayer to restrain illegal official acts, to prevent waste and compel restoration of the taxpayer's property by illegal action of the board (General Municipal Law [Cons. Laws, ch. 24], § 51; *Lewis* v. *Board of Education*, 258 N. Y. 117).

Pursuant to provisions of the Education Law (§§ 134, 206, 310 and 1020), the defendant had for some time prior to the commencement of the action provided free transportation to and from the public schools in the district for physically handicapped pupils of such schools and for those pupils who resided so remote therefrom that they were practically deprived of school advantages without such transportation. No such transportation was provided by the defendant for pupils resident therein who attended private or denominational schools.

In 1936, the Legislature amended section 206 of the Education Law (Laws of 1936, ch. 541, in effect September 1, 1936) so that the material part, with changes and additions in italics, reads as follows:

" 18. Whenever any district shall have contracted with the school authorities of any city, or other school

district for the education therein of the pupils residing in such school district, or whenever in any school district children of school age shall reside so remote from the schoolhouse therein *or the school they legally attend* that they are practically deprived of school advantages during any portion of the school year, the inhabitants thereof entitled to vote are authorized to provide, by tax or otherwise, for the conveyance of any or all pupils residing therein (*a*) to the schools of such city, or district with which such contract shall have been made, or (*b*) to the school maintained in said district *and to schools, other than public, situate within the district or an adjacent district or city. Whenever conveyance of pupils shall be so provided for by vote of the inhabitants, the school district and the school trustees shall provide, if need be, one or more routes so that all children of school age ·in said district shall equally be afforded transportation facilities.*

" And the trustees [thereof] *of the district* may contract *with any person, corporation or school district* for such con-.veyance when so authorized in accordance with such rules and regulations as they may establish, *consistent with rules and regulations of the commissioner of education,* and for the purpose of defraying any expense incurred in carrying out the provisions of this subdivision, they may if necessary use any portion of the public money apportioned to such district. * * * "

At a special district meeting of the voters of the public school district held on January 7, 1937, a proposition to appropriate moneys to provide transportation for pupils who attended a certain parochial school was defeated. The school was located outside of School District No. 2, was wholly under the control and direction of a religious denomination, and denominational tenets and doctrines were therein taught. Upon appeal to the Commissioner of Education, it was held that, under the statute as it stood in its amended form, if free transportation should be provided for pupils who attended the free common

schools, similar transportation facilities must be provided for all pupils similarly situated who were attending private and parochial schools. The authority of the Commissioner to make such an order is unquestioned (*People ex rel. Board of Education* v. *Graves*, 243 N. Y. 204). As a consequence, a second meeting of the voters was held, an appropriation was made and a tax levied to meet the appropriation. The right to have parochial school pupils transported at public expense is asserted solely by virtue of the amendment of 1936 to section 206 of the Education Law. It is the claim of the plaintiffs that the section, in so far as it purports to or does authorize the use of public funds for the transportation of pupils to and from private schools or schools wholly or in part under the control or direction of any religious denomination or in which denominational tenets or doctrines are taught is in violation of article IX of the State Constitution and that the action taken thereunder by defendant is void. The case reaches us, after affirmance of a judgment on the pleadings dismissing the complaint, upon a certificate of the Appellate Division that a question of law is involved which should be here reviewed.

The provisions of article IX of our Constitution (adopted in 1894) are the ones under consideration here.

Section 1 makes it mandatory for the Legislature to " provide for the maintenance and support of a system of free common schools, wherein all the children of this State may be educated." Under this provision, the schools provided must be sufficiently numerous so that *all the children of the State* may receive their education, whatever may be their race, creed, color, or condition. Private, denominational and sectarian schools, and schools or institutions of learning in which denominational tenets or doctrines are taught or those wholly or in part under the

control or direction of any religious denomination are no part of and are not within that system. Amendments designed to bring such schools into the system of common schools were discarded by the convention which framed the Constitution. The *common school system* of the State was established by chapter 242 of the Laws of 1812. By that act, creation of school districts was authorized, the control of education in all the separate districts was vested in district trustees, inspectors, or town school commissioners to be elected by the people, and continued under the supervision of the State Superintendent of Instruction. Some additions were made by chapter 52 of the Laws of 1813. These acts were repealed and re-enacted by chapter 192 of the Laws of 1814 entitled " An act for the better establishment of common schools." The idea that the people must provide for the expense of education first finds expression in chapter 75 of the Laws of 1795, where the Legislature appropriated twenty thousand pounds per year for five years out of the annual revenue of the State " for the purpose of encouraging and maintaining schools in the several cities and towns in this State " other than colleges and academies. *This constituted the origin of the common school fund of the State.* (See, also, Laws of 1796, ch. 49; Laws of 1797, ch. 34; Laws of 1801, ch. 189; Laws of 1805, ch. 108; Laws of 1807, chs. 20 and 32.) Under the act of 1812, revised in 1814 as above indicated, the moneys in the common school fund theretofore created and enlarged from year to year were required to be apportioned by the State Superintendent of Instruction among the various counties which in turn were required to spend such moneys together with such other moneys as they might themselves collect for education under the provisions of that act to the use of the common schools exclusively. The Legislature by chapters 161 and 212 of the Laws of 1819 continued the apportionment and use of the common school fund. Thereupon the people in article VII, section 10, of the Constitution of 1821

definitely established the common school fund as a *perpetual fund* to be used exclusively for the support of the common schools throughout the State. By chapter 150 of the Laws of 1842 the Legislature extended aid from this fund, previously used principally in upstate localities, to the city of New York to be distributed and used in a similar manner as in other localities. By that act the common school system was extended generally to apply to the city of New York. The provisions of article VII, section 10, of the Constitution of 1821 were readopted in article IX of the Constitution of 1846 and, in identical form, in article IX, section 3, of the Constitution of 1894. The State thus organized a secular common school system of education throughout the State and supports it by public funds. These schools are free to all. The cost of construction of common schools and the funds necessary for their maintenance and in aid of education therein are provided by taxation by the localities in which. the schools are located and by the State out of the common school and other public funds.

Section 2 of article IX of the present Constitution continues the University of the State of New York, incorporated under the name of " The Regents of the University of the State of New York " in 1784 (Laws of 1784, ch. 51). The act of 1784 was amended in minor particulars in chapter 15 of the Laws of 1785. Those acts were repealed by chapter 82 of the Laws of 1787. By that act, however, the Regents were reincorporated, their powers continued and enlarged, and provision was made that the members of the board should be appointed by the Legislature and should hold office during its pleasure. Thus *common school education* within the State came *exclusively under public control* and has since so remained.

Section 4 of article IX of the Constitution provides that " Neither the State nor any subdivision thereof, shall use its property or credit or any public money, or

authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." The origin, history, and prohibition of the use of the common school fund to other than common schools have already been adverted to. This section restricts the use of all public moneys or moneys raised by taxation for educational purposes exclusively to the common schools.

Since our organization as a State we have clearly and unequivocally indicated that there must be a complete severance between denominational or sectarian schools on the one hand and the public common schools on the other. As early as 1805 (Laws of 1805, ch. 108) the Legislature provided specifically that funds for the establishment of free schools for the education of poor children in New York city could be so used only where those children did not belong to or were not provided for by any religious society. Section 14 of the act of 1842 (ch. 150) specifically barred schools which taught religious or sectarian doctrines from receiving any public money in aid or support thereof. To further clarify the matter, the Legislature provided in section 12 of chapter 320 of the Laws of 1844 that " no school shall be entitled to a portion of the school moneys in which the religious sectarian doctrine or tenet of any particular Christian, or other religious sect shall be taught, inculcated or practised, or in which any book or books containing compositions favorable or prejudicial to the particular doctrine or tenets of any Christian sect, or which shall teach the doctrine or tenets of any other religious sect, or which shall refuse or permit the visits and examinations provided for in this act." In 1853, citizens of New York State who were members of a certain religious denomination petitioned the Legislature to authorize the estab-

lishment of schools where religion might be taught and to grant to such schools a portion of the common school fund and of other school moneys raised by taxation. The committee having the proposal in charge reported upon the general policy of separation of church and State in connection with the support and maintenance of the educational system and asserted that they could not grant this privilege to one sect without opening the door for applications from every sect in the State, and " in view of their number, the conflicting and contradictory nature of their tenets, we should regard as suicidal the attempt to embrace them in the system of our common schools, or sustain them by its funds." The committee predicted that a policy of that kind would completely ruin the common school system and would open the door for a dangerous and vicious controversy among the different religious denominations as to who should get the largest share of school funds. (See Assembly Document No. 97, 1853; Lincoln's Constitutional History of New York, vol. III, pp. 571–573.) The question of the propriety of sectarian or denominational schools relying for aid or support upon public funds seems to have remained dormant until the meeting of the Constitutional Convention in 1894. When the proposal to amend article IX of the Constitution was taken up in the committee of the whole (Revised Record of the Constitutional Convention, 1894, vol. 3, p. 689 *et seq.*), the report of the committee on education contained the clause that " this section [referring to section 4] shall not apply to schools in institutions subject to the visitation and inspection of the State Board of Charities " (p. 739). This clause would have nullified the effect of the other provisions of section 4 as finally adopted. The clause was stricken out on the grounds, among others, that it " is in flagrant derogation of a sound and universal principle, that none but public schools shall receive the support of public moneys, and that the people of this

State, or any section of this State, shall not be taxed for the support of education of a sectarian nature in any schools whatever." The arguments against the present constitutional provision, that it was discriminatory, that it was contrary to the requirements of public welfare, and that support of religious schools was in fact given to the children rather than to the schools involved, were urged but without success, and proponents of the efforts to authorize denominational schools to receive State aid in connection with education were compelled to submit to the conclusion that it was contrary to public opinion and contrary to the theory under which the free common school system was founded. As late as November 6, 1923, the principles underlying and expressed in article IX of the Constitution were reasserted when the Home Rule Amendment for Cities was adopted, wherein it was provided that nothing therein contained should " apply to or affect the maintenance, support, or administration of the public school systems in the several cities of the state, as required or provided by article nine of the constitution " (Art. XII, § 7).

While the provisions of article IX of the Constitution formally establish the public policy of the State, it is seen, therefore, that they merely crystallize into the fundamental law in mandatory form earlier decisions made by the people and recognized by the Legislature since the organization of the State and the adoption of the first Constitution. While a close compact had existed between the Church and State in other governments, the Federal government and each State government from their respective beginnings have followed the new concept whereby the State deprived itself of all control over religion and has refused sectaries any participation in or jurisdiction or control over the civil prerogatives of the State. And so in all civil affairs there has been a complete separation of Church and State jealously guarded and unflinchingly maintained. In conformity

with that concept, education in State supported schools must be non-partisan and non-sectarian. This involves no discrimination between individuals or classes. It invades the religious rights of no one. While education is compulsory in this State between certain ages, the State has no desire to and could not if it so wished compel children to attend the free public common schools when their parents desire to send them to parochial schools (*Pierce* v. *Society of Sisters*, 268 U. S. 510), but their attendance upon the parochial school or private school is a matter of choice and the cost thereof not a matter of public concern. As Judge POUND aptly said in *People ex rel. Lewis* v. *Graves* (245 N. Y. 195, 198), " Neither the Constitution nor the law discriminates against religion. Denominational religion is merely put in its proper place outside of public aid or support." We furnish free common schools suitable for all children of the State regardless of social status, station in life, race, creed, color or religious faith. Any contribution directly or indirectly made in aid of the maintenance and support of any private or sectarian school out of public funds would be a violation of the concept of complete separation of Church and State in civil affairs and of the spirit and mandate of our fundamental law.

The argument is advanced that furnishing transportation to the pupils of private or parochial schools is not in aid or support of the schools within the spirit or meaning of our organic law but, rather, is in aid of their pupils. That argument is utterly without substance. It not only ignores the spirit, purpose and intent of the constitutional provisions but, as well, their exact wording. The object of construction as applied to a written constitution is to give effect to the intent of the people in adopting it and this intent is to be found in the instrument itself unless the words or expressions are ambiguous (Cooley's Constitutional Limitations [8th ed.], vol. 1, pp. 124–126). There is nothing ambiguous here. The wording of the

mandate is broad. Aid or support to the school " directly or indirectly " is proscribed. The two words must have been used with some definite intent and purpose; otherwise why were they used at all? Aid furnished " directly " would be that furnished in a direct line, both literally and figuratively, to the school itself, unmistakably earmarked, and without circumlocution or ambiguity. Aid furnished " indirectly " clearly embraces any contribution, to whomsoever made, circuitously, collaterally, disguised, or otherwise not in a straight, open and direct course for the open and avowed aid of the school, that may be to the benefit of the institution or promotional of its interests and purposes. How could the people have expressed their purpose in the fundamental law in more apt, simple and all-embracing language? Free transportation of pupils induces attendance at the school. The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it. " It helps build up, strengthen and make successful the schools as organizations " (*State ex rel. Traub* v. *Brown*, 36 Del. 181, 187, writ of error dismissed, Feb. 15, 1938). Without pupils there could be no school. It is illogical to say that the furnishing of transportation is not an aid to the institution while the employment of teachers and furnishing of books, accommodations and other facilities are such an aid. In the instant case, $3,350 was appropriated out of public moneys solely for the transportation of the relatively few pupils attending the specific school in question. If the cardinal rule that written constitutions are to receive uniform and unvarying interpretation and practical construction is to be followed, in view of interpretation in analogous cases, it cannot successfully be maintained that the furnishing of transportation to the private or parochial school out of public money is not in aid or support of the school. A similar argument was advanced in *Smith* v. *Donahue* (202 App. Div. 656), in *State ex rel. Traub* v. *Brown*

(*supra*), and in *Williams* v. *Board of Trustees* (173 Ky. 708, revg., on rehearing, 172 Ky. 133) and discarded.

We have found but two decisions upon the precise question involved in this case (*State ex rel. Van Straten* v. *Milquet*, 180 Wis. 109, and *State ex rel. Traub* v. *Brown, supra*), in both of which it was held that the furnishing of transportation at public expense to private or parochial school children was prohibited by the provisions of their respective Constitutions which were similar to ours. To like effect was Report of the Minnesota Attorney-General, 1920, page 300.

A related question arises on the constitutionality of statutes authorizing the furnishing out of public funds of free textbooks to private schools. Such a statute was held unconstitutional in *Smith* v. *Donahue* (*supra*). It was there urged that the furnishing of the textbooks was in aid of the pupils rather than in aid of the schools, but the court unanimously reached a contrary result. It is said that *Cochran* v. *Louisiana State Board of Education* (281 U. S. 370) is controlling authority to the contrary. That is not the case, however. In *Borden* v. *Louisiana State Board of Education* (168 La. 1005) it was held that the furnishing of school books to all the children of the State regardless of where they attended school did not violate a constitutional provision of that State to the effect that no money should ever be taken from the public treasury, directly or indirectly, in aid of any church or religious association, or another constitutional provision to the effect that no public funds should be used for the support of any private or sectarian school, on the ground that the private or sectarian schools were not the beneficiaries of the appropriations made for that purpose but rather the school children and the State alone. Three of the seven judges of the court dissented from that reasoning. That decision was immediately followed in the *Cochran* case (168 La. 1030), which latter went to the Supreme Court. The question of the con-

stitutionality of the act authorizing the appropriation of public funds for the purpose indicated under the Louisiana Constitution was not a Federal question, and the only question involved or decided in the Supreme Court was whether or not the act in question authorized the taking of private property for a private purpose and was thus violative of the provisions of the Fourteenth Amendment to the Federal Constitution. The reasoning followed in the Louisiana State courts has been followed in no other case to which our attention has been called, but has been expressly disapproved in *State ex rel. Traub* v. *Brown (supra)*. In the *Borden* case the minority presented the better-reasoned opinion, in accord with the reasoning in *Smith* v. *Donahue,* and said, among other things: " The maintenance of private or sectarian schools, however valuable may be the work which they perform, is not a public purpose so as to justify the expenditure of the public money in their support. School books are as essential to the means of imparting instruction to children as are other educational appliances, school houses and school teachers. But I do not believe that any one will contend for a moment that, in face of the prohibitory clauses of the Constitution, money can be taken from the public treasury for the purpose of furnishing the children in private and sectarian schools with these necessary educational facilities. To say the least, the appropriation of the public funds for the purchase of books for all the children of the state is an attempt to do indirectly that which cannot be done directly. The argument of resultant benefit to the state must and does fall before the rule of public policy established in the organic law itself that the welfare of the state can be best promoted by prohibiting appropriations from the public treasury in aid of any church, religious denomination, private charitable, or benevolent purpose, private or sectarian school."

The courts of this country have been unanimous in prohibiting a use of public funds to pay, directly or

indirectly, tuition fees of pupils in private or sectarian schools (*Williams* v. *Board of Trustees, supra; Otken* v. *Lamkin,* 56 Miss. 758; *Synod of Dakota* v. *State,* 2 S. D. 366; *Opinion of the Justices,* 214 Mass. 599; *People ex rel. Roman Catholic Orphan Asylum Soc.* v. *Board of Education,* 13 Barb. 400), in spite of the argument presented that tuition fees were for the benefit of pupils exclusively and not for the schools and the economic argument that it would be less expensive for the State to pay the tuition fees of these children in private schools than to provide for them in public schools.

Some reliance is also placed on the decision in *Sargent* v. *Board of Education* (177 N. Y. 317). It was a taxpayer's action brought to restrain the defendant from providing out of public funds for the secular education of inmates of an incorporated orphan asylum maintained and controlled by a religious corporation, on the ground that chapter 261 of the Laws of 1850 under which the expenditures were authorized was repealed by article IX, section 4, of the Constitution and that such expenditures were unauthorized and unconstitutional. It was held as a basis for decision for the defendant that the particular asylum was neither a school nor an institution of learning and that " the system of statutory law for the maintenance of charities administered by private corporations did not fall when the Constitution went into effect " (p. 323).

It is claimed that the statute may be sustained as a valid exercise by the Legislature of the police power of the State. This argument overlooks the consideration than even the police power must be exercised in harmony with the restrictions imposed in the fundamental law (*Colon* v. *Lisk,* 153 N. Y. 188; *People ex rel. Wineburgh Adv. Co.* v. *Murphy,* 195 N. Y. 126, 131; *Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271, 300; *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398).

Some reliance has been placed upon the decision in *People* v. *Ewer* (141 N. Y. 129), which, it is asserted, sustains the broadest kind of regulation over children.

The case is not in point. The parent of a child of seven years of age was arrested for violation of section 292 of the Penal Code for publicly exhibiting the child as a dancer, and it was held that the statute was not repugnant to any provision of the Constitution guaranteeing personal freedom and rights to the individual. The decision was grounded in the proposition that, in the exercise of the police power of the State, the Legislature had the right to supervise and control services and exhibitions of a child in the interests of public morals inasmuch as such supervision and control was within the limits and outside of the restrictions of the provisions of the Constitution.

No authority has been called to our attention nor has one been found in any jurisdiction to the effect that a statute purporting to be enacted in the exercise of the police power of the State may be held valid if repugnant to any constitutional provision or restriction. " A written constitution," said Judge WERNER in *Wright* v. *Hart* (182 N. Y. 330), " is the fundamental expression of the sovereign will. Under our form of government that sovereign will resides in the people. A written constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government in respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it " (p. 333). When that sovereign will has been clearly expressed, it is the duty of the courts rigidly to enforce it. It is not the province of the courts to circumvent it because of private notions of justice or because of personal inclinations (*People ex rel. Roman Catholic Orphan Asylum Soc.* v. *Board of Education*, 13 Barb. 400, 411; Cooley's Constitutional Limitations [8th ed.], vol. 1, pp. 124–126, and cases cited). " Eternal vigilance," said Judge POUND in *People ex rel. Lewis* v. *Graves* (245 N. Y. 195, 199), " is the price of constitutional

rights." Reiterating the necessity of protecting the sovereign will as expressed in our Constitution, Chief Judge CRANE said in *Matter of Andresen* v. *Rice* (277 N. Y. 271), " It is not for us, however, to pass upon the best methods of selection or the wisdom of legislation. We have a constitution * * * and we, like everybody else, are bound to follow it " (p. 280). In *Colon* v. *Lisk* (*supra*) this court said, " Whenever the legislature passes an act which transcends the limits of the police power, it is the duty of the judiciary to pronounce it invalid, and to nullify the legislative attempt to invade the citizen's rights " (p. 197). No claim of right to transportation furnished by public funds can be asserted in the interest of the health, safety and welfare of the pupils of the private or parochial school for any such claim is moderated by the specific provisions of the Constitution (*Ives* v. *South Buffalo Ry. Co.*, *supra*, p. 300). The statute, in so far as it authorizes the use of public funds for transportation of pupils to and from any school or institution of learning wholly or in part under the control or direction of any religious denomination or in which any denominational tenet or doctrine is taught, is repugnant to our fundamental law, unconstitutional and void. Attention has been called to the fact conceded by the pleadings that the defendant has appropriated $3,350 of public funds for the purpose of transporting pupils to a private school at which denominational tenets and doctrines are taught, which sum has been added to the budget of defendant, a tax has been levied upon the taxable property of the school district for the purpose of meeting such appropriation, and a lien exists against the property of the plaintiffs. Plaintiffs seek judgment enjoining and restraining the Board, its members, trustees, agents, officers and employees, from furnishing transportation for pupils attending the school in question and that such assessment, levy and lien on the property of plaintiffs be vacated, canceled and removed as a cloud

on the title to their property. Upon the pleadings, the plaintiffs are entitled to such relief and such further relief as by the Special Term may be deemed necessary completely to restore the plaintiffs to the same position in which they stood prior to the making of the appropriation in question.

The judgments appealed from should be reversed and the case remitted to the Special Term to proceed in accordance with this opinion, without costs.

CRANE, Ch. J. (dissenting). In this taxpayer's action, instituted under section 51 of the General Municipal Law, to restrain the Board of Education from furnishing transportation to pupils of private schools, the plaintiffs attack the constitutionality of subdivision 18 of section 206 of the Education Law, under the authority of which the transportation was furnished. In so far as material here that section provides: " * * * whenever in any school district children of school age shall reside so remote from the schoolhouse therein or the school they legally attend that they are practically deprived of school advantages during any portion of the school year, the inhabitants thereof entitled to vote are authorized to provide, by tax or otherwise, for the conveyance of any or all pupils residing therein (a) to the schools of such city, or district with which such contract shall have been made, or (b) to the school maintained in said district and to schools, other than public, situate within the district or an adjacent district or city. Whenever conveyance of pupils shall be so provided for by vote of the inhabitants, the school district and the school trustees shall provide, if need be, one or more routes so that all children of school age in said district shall equally be afforded transportation facilities."

The sole ground of attack on the constitutional validity of this statute is that it infringes article IX, section 4, of the State Constitution, which reads: " Neither the State nor any subdivision thereof, shall use its property

or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." It is conceded that the school to which transportation is furnished here comes within the class specified in this section of the Constitution.

It will be observed that the constitutional provision referred to not only recognizes the right of such schools to exist, but by implication, authorizes the expenditure of public money " for examination or inspection " of such schools. Nevertheless, our fundamental law provides that neither the State nor any political subdivision shall permit its money, credit or property to be used " in aid or maintenance " of any such religious schools. The Legislature may not disobey the mandate of the Constitution, and should they do so the courts may not hesitate to declare the infringement of the constitutional mandate. (The question presented here is whether the Legislature has authorized a political subdivision of the State to use its money "in aid or maintenance " of any school of the class named in the Constitution.

Article 23 of the Education Law deals with compulsory education. Under section 620: " A minor required to attend upon instruction by the provisions of this article may attend at a public school or elsewhere. The requirements of this section shall apply to such a minor, irrespective of the place of instruction." The section prescribes the quality and language of instruction, courses of study, and length of school sessions. Section 621 prescribes the age limit within which minors must attend upon full time instruction, and section 622 sets forth the conditions under which he may attend part-time school. Section 625 provides for the amount and character of the required attendance: " If a minor included by the provisions of this article attends upon instruction elsewhere

than at a public school, he shall attend for at least as many hours, and within the hours specified therefor." (Id.) Every person in parental relation to a minor " shall cause such minor to attend upon instruction as hereinbefore required  *  *  *." (§ 627, subd. B-2.)  The provisions relating to attendance at school are enforced by attendance officers who may arrest truants (§ 640).  A violation of the article is punishable by a fine (§ 641).

The Legislature recognizes the right of parents to send their children for instruction to schools other than public schools.  It could not do otherwise consistently with the Fourteenth Amendment to the United States Constitution.  (*Pierce* v. *Society of Sisters*, 268 U. S. 510.) Nevertheless, it has commanded all minors within certain ages to attend school and requires those in parental relation to cause the children to attend upon instruction as provided.  When a child is enrolled in a school, public or otherwise, regular attendance is compulsory.) A child may be sent to a public school or to a private school, but those in charge of the child are not free to permit the child to grow up without any instruction whatever.

Having made attendance upon instruction compulsory and having approved of attendance at certain schools other than public schools, the Legislature determined that the inhabitants of the district should have the power, under certain conditions, to provide for the transportation of the pupils to and from the schoolhouse in the district or the school which they legally attend.  The object of such legislation is apparently to insure the attendance of the children at their respective schools for the requisite period of instruction and, perhaps, to safeguard the health of the children.  The statute is not designed to aid or maintain the institutions themselves.  Recognizing the right of the children to be sent to such schools, and enjoining upon them the duty of regular attendance, the Legislature gave the authorities power, in a proper case, to assist the children in getting to their school.) The

law says to the children and parents: Having chosen a proper school, you must attend regularly. The school district has been given the power to add to that: Where necessary, we shall assist you in getting there.

The statute in question does not have the effect of giving public money, property or credit in aid or maintenance of religious schools. The aid is given to the pupils who are legally attending such schools, to assist them to spend the required time in attendance upon instruction. In most cases those in parental relation choose the school at the beginning of the school year, and the arrangements for transportation cannot be initiated until the attendance figures show whether and to what extent such facilities may be needed. There is no benefit to the schools except, perhaps, as one may conceive an accidental benefit in the sense that some parents might place their children in religious schools when they anticipate transportation provision, though they might hesitate to do so if the children were compelled to make their own way. The constitutional provision is not designed to discourage or thwart the school where religious instruction is imparted. " Denominational religion is merely put in its proper place outside of public aid or support." (*People ex rel. Lewis* v. *Graves*, 245 N. Y. 195, 198.)

The judgment should be affirmed.

LEHMAN, HUBBS and FINCH, JJ., concur with RIPPEY, J.; CRANE, Ch. J., dissents in opinion, in which O'BRIEN and LOUGHRAN, JJ., concur.

Judgment accordingly. (See 278 N. Y. 712.)