Deyo, J.
This proceeding brings up for review the constitutionality of section 5001 of the Education Law insofar as it makes the Commissioner of Education’s approval of the tuition to be charged one of the requisites for the issuance of a license to operate a trade school.
Petitioner has been operating a duly licensed beauty culture school since 1938. It has during this period, and in addition to the regular tuition, made charges to its students for lockers, *123 notebooks and various certificates. The commissioner apparently acquiesced in this practice until 1947, when he expressly disapproved such fees. Petitioner, however, continued to make these charges and the matter was brought to a head by a denial of its application for a renewal of its license for 1949-1950 unless it would agree to discontinue the practice and refund the amounts so collected during the previous year. The petitioner has refused to comply with these conditions and has brought this proceeding to test the constitutionality of the statute pursuant to which they were imposed.
The pertinent provisions of the statute involved read as follows: “ No license shall be issued under the provisions of this section until said commissioner has approved the method and content of the advertising, the standards and the methods of instruction, the equipment and housing provided, the qualifications of teachers, the form and content of the student enrollment agreement or contract, the tuition to be paid and the method of collecting tuition.” (Italics supplied.)
We assume, as do the parties, that extra charges of this nature, however designated, are in reality part of the tuition and that whatever regulatory power the commissioner has in this respect is predicated upon the statutory provision italicized above.
It will not be denied that education in general and schools in particular, be they public or private, are matters of public concern warranting some regulatory legislation. The question presented relates to the scope and extent to which such regulation is permissive under the Constitution. The power to fix prices, and tuition is nothing more than that, is justifiable, if at all, only as an exercise of the inherent police power of the State. Price fixing is a drastic remedy to be employed only where the ills are real and the danger imminent. It can be resorted to only under special circumstances. As Pound, Chief Judge, said in People v. Nebbia (262 N. Y. 259, 264-265, aifd. sub nom. Nebbia v. New York, 291 N. S. 502) in discussing price fixing in the milk industry, ‘ ‘ The power thus to regulate private business can be invoked only under special circumstances. It may be so invoked when the Legislature is dealing with a paramount industry upon which the prosperity of the entire State in large measure depends. It may not be invoked when we are dealing with an ordinary business, essentially private in its nature.” This jurist expressed the same thought in slightly different form in People ex rel. Durham Realty Corp. v. La Fetra (230 N. Y. 429, 445, writ of error dismissed sub nom. People ex rel. Brixton Operating Corp. v. La Fetra, 257 U. S. 665) where rent control *124 was the issue, as follows: “ Aside from the war power, the regulation of prices, except for public utilities, is unusual * * *. It may embrace all cases of public interest, and the question is whether the subject has become important enough for the public to justify public action.” Lehman, J., wrote in similar vein in People v. Weller (237 N. Y. 316, affd. sub nom. Weller v. New York, 268 U. S. 319) in connection with the brokerage charges on the resale of theatre tickets. He said at page 321, “ Such restrictions interfere with the liberty of those desiring to engage in that business and are lawful only if imposed by the legislature in the exercise of what has come to be described as ‘ police power. ’
“ The time has properly passed when any useful purpose can be served by further discussion of the general nature of the police power or even in most cases by citation of general definitions, though contained in opinions which we might consider authoritative. When the attempted exercise by the legislature of the power to regulate certain kinds of business and especially to fix prices was first challenged in the courts, the courts laid down the general rule that the power to regulate and fix prices depends upon whether the business is so ‘ clothed with a public interest ’ as to justify reasonably the imposition of regulations calculated to remove abuses, or perhaps even to secure benefits, in regard to features which clearly affect the public. This general rule is now well recognized but the limits of its application are still somewhat shadowy and indefinite.”
In the three cases above cited the courts held the price fixing statutes to be constitutional, but in each instance the court went to considerable pains to point out that it was doing so because of the nature of the subject matter of the legislation. Price fixing of milk was justified since it was a “ chief industry of the State ”, which had reached a “ critical state ” due to price cutting and business recession, giving rise to “ scenes of violence and disorder.” Stabilization of rents was held proper because of the “ emergency ” and “ a great public need ” in private housing, which had become “ abnormal ” with “ profiteering ” and “ oppression general.” Regulation of the brokerage on theatre tickets was found warranted because it related to places of public amusement “ always regarded as affected with a public interest, ’ ’ and because of a legislative finding that “ extortion from the general public ” was being practiced.
By no stretch of the imagination can it be said that the record in the instant case discloses any such critical, abnormal or quasi *125 criminal situation. In fact, it is all "but silent on this score and the respondent does not even argue the matter except in the most general terms. Rather, it seems to take the position that since education is concededly a matter of general concern warranting regulation by the State that the power to fix tuition rates follows ipso facto. This is entirely contrary to the established principles heretofore pointed out and to general concepts concerning the freedom of education. As Rippey, J., said in Judd v. Board of Education (278 N. Y. 200, 211): “ While education is compulsory in this State between certain ages, the State has no desire to and could not if it so wished compel children to attend the free public common schools when their parents desire to send them to parochial schools * # *, but their attendance upon the parochial school or private school is a matter of choice and the cost thereof not a matter of public concern.” (Emphasis supplied.)
It may well be that the power to regulate certain phases of private school operation such as the nature of curriculum, the qualifications of teachers and the like, is a necessary and indispensable corollary to the State’s supervisory jurisdiction over education in general. In such fields general interest is obvious lest untrained and improperly prepared technicians be foisted upon an unsuspecting public. What that embryo technician, be he hair stylist or masseur, dentist or doctor, may have paid for his education is purely a personal matter between himself and the school of his choice, in which the public has no proper concern. If the State may fix the fees which a trade school may charge for its services, then it can do the same regarding every private school and for that matter every profession or calling where a license is required. Although we may feel that our feet are on the path leading to that point, we have not reached it yet.
In the absence of any showing whatsoever that tuition in trade schools is a matter of great public concern or affected with a public interest, any attempt on the part of the Legislature to fix the rates thereof is an unnecessary and unwarranted interference with individual liberty, and hence unconstitutional.
The order should be reversed and the respondent directed to issue to the petitioner forthwith a renewal of its license to operate a trade school for the year 1949-1950, with costs to the petitioner.
Brewster and Bergan, JJ., concur with Deyo, J.; Foster, P. J., dissents, in the following memorandum, in which Heffernan, J., concurs: I am constrained to dissent from the opinion *126 for reversal in this case on the ground that the legislation involved is not beyond the police power of the State. To my mind a trade school for the teaching of beauty culture in this day and generation is a business at least as much “ clothed with a public interest ” as a theatre or place of amusement (People v. Weller, 237 N. Y. 316). Hence I think it a proper subject for regulation.
Order reversed, on the law, and the respondent directed to issue to the petitioner forthwith a renewal of its license to operate a trade school for the year 1949-1950, with $50 costs to the petitioner.