Van Voorhis, J.
(dissenting). Plaintiff Boards of Education have, as it seems to us, capacity to sue. The cases holding that a public body has no standing to challenge a State statute restricting its governmental powers are not in point (e.g., City of Buffalo v. State Bd. of Equalization, 26 A D 2d 213; County of Albany v. Hooker, 204 N. Y. 1, 9-10; Black Riv. Regulating Dist. v. Adirondack League Club, 307 N. Y. 475, 487; St. Clair v. Yonkers Raceway, 13 N Y 2d 72, 76, cert, den. 375 U. S. 970). The reasons for this conclusion are adequately stated in the opinion by Special Term and in the concurring opinion at the Appellate Division. These Boards of Education are not seeking to augment their powers by obtaining an adjudication that a statute is unconstitutional which purports to restrict their authority, but, instead, they are asking for a court determination (in the form of a declaratory judgment) concerning whether they are legally authorized to spend public money for purposes purporting to be authorized by this statute. If subdivision 3 of section 701 of the Education Law (as amd. by L. 1965, ch. 320, and L. 1966, ch. 795) is unconstitutional insofar as it authorizes the purchase of textbooks by school boards for loan to children enrolled in parochial schools, then the school boards would exceed their powers in making such expenditures. Upon the other hand, if that statute is valid, as the State Commissioner of Education has ruled, any disobedient school board member becomes liable to removal from office (Education Law, §§ 306, 1706) and the Commissioner may withhold public moneys from any district whose school board disobeys the Commissioner’s directive implementing the statute.
The right of a local Board of Education to sue the State Commissioner of Education has frequently been upheld including actions involving the question of constitutionality of State statutes. (Matter of Board of Educ. of Cent. School Dist. No. 2 v. Allen, 14 A D 2d 429; Matter of Bethlehem Union Free School Dist. v. Wilson, 303 N. Y. 107; Matter of Board of Educ. of Union Free School Dist. No. 3 v. Allen, 6 A D 2d 316, affd. 6 N Y 2d 871.)
*119 This brings us to the question whether this statute violates section 3 of article XI of the New York State Constitution, which reads as follows: “ Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning.”
The last portion of this section, relating to the transportation of children, was added by special amendment to obviate the immediate impact of the decision in Judd v. Board of Educ. (278 N. Y. 200 [1938]). The Judd ease held that this provision of the State Constitution was violated by the then section 206 of the Education Law insofar as it purported to authorize the use of public funds to pay for the transportation of pupils to or from schools wholly or in part under the control or direction of religious denominations or in which religious doctrines or tenets were taught. The providing of schoolbooks for such schools touches more nearly what section 3 of article XI of the Constitution was designed to prohibit than the transportation of pupils by bus. The origin and purpose of this constitutional provision are discussed so thoroughly in the opinion of the court by Judge Rippey that we shall not repeat here what was said. It is argued here that in the Judd case, the expenditures were to be for the benefit of the parochial schools, whereas under this statute, they are for the pupil under the so-called child benefit theory. The court in the Judd case, however, cites and follows Smith v. Donahue (202 App. Div. 656) which held to be unconstitutional a construction of subdivision 4 of the then section 868 of the Education Law which would authorize Boards of Education to furnish free textbooks and other supplies to the children attending parochial schools. The Appellate Division, Third Department, there said (p. 664): “It seems to us to be giving a strained and unusual meaning to words if we hold that the books and the ordinary school supplies, when furnished for the use of pupils, is a furnishing to the pupils and not a furnishing in aid or maintenance of a school of learning. It seems very plain *120 that such furnishing is at least indirectly in aid of the institution and that, if not in actual violation of the words, it is in violation of the true intent and meaning of the Constitution and in consequence equally unconstitutional. (People ex rel. Bolton v. Albertson, 55 N. Y. 50; Matter of Hopper v. Britt, 203 id. 144.) ” The Smith case was, as above stated, cited with approval and followed in Judd.
Unless Judd and Smith be overruled, they are decisive of the present issue. It does not seem to us that any basic change has been wrought by the passage of time in the factors considered in Judd and Smith. The subject is controversial, and has been controversial in this country for over 200 years. It is unlikely that new developments have materially altered the basic considerations.
If this provision in the State Constitution were to be equated in these respects with the First Amendment to the Federal Constitution, it is by no means clear that the result would be different. It is true, to be sure, as stated by Justice Jackson in McCollum v. Board of Educ. (333 U. S. 203, 238) that there are times when ‘ ‘ the legal ‘ wall of separation between church and state ’ [becomes] as winding as the famous serpentine wall designed by Mr. Jefferson for the University he founded.” Nevertheless, the tendency of the Supreme Court has been rather strict in maintaining this wall of separation for reasons eloquently stated many years ago by Madison and Jefferson (Engel v. Vitale, 370 U. S. 421; Abington School Dist. v. Schempp, 374 U. S. 203; McCollum v. Board of Educ., 333 U. S. 203, supra). Everson v. Board of Educ. (330 U. S. 1, permitting payments for bus transportation) might have been decided differently today, inasmuch as it was decided five to four with Justice Douglas in the majority. He later wrote in Engel v. Vitale (370 U. S. 421), at page 443, that “ The Everson case seems in retrospect to be out of line with the First Amendment * * * Mr. Justice Rutledge stated in dissent what I think is durable First Amendment philosophy ”.
These and other decisions by the Supreme Court seem to have outdistanced Cochran v. Board of Educ. (281 U. S. 370). The Supreme Court therein was not bound by the First Amendment, which had not then been mandated on the States by the Fourteenth Amendment to the Federal Constitution, and the Louisi *121 ana court had held that there was no violation of the Louisiana Constitution (Borden v. Louisiana State Bd. of Eduo., 168 La. 1005). The furnishing of textbooks to the students of parochial schools was there sought to be restrained under the Fourteenth Amendment alone, as taking private property for a private purpose. The argument there prevailed that public aid was for the purchase of schoolbooks for the use of children rather than being for the school itself. This “ student benefit theory ” is hardly new, as respondents-intervenors assert that it is. It was overruled in this State in Smith v. Donahue (supra) and this court stated in the Judd case that the constitutionality of the Louisiana statute authorizing the appropriation of public funds for textbooks was decided under the Louisiana Constitution and “ was not a Federal question.” (278 N. Y., supra, pp. 213-214). Our opinion in Judd continued by stating: “ The reasoning followed in the Louisiana State courts has been followed in no other case to which our attention has been called, but has been expressly disapproved in State ex rel. Traub v. Brown, supra [36 Del. 181, 187, writ of error dsmd. Feb. 15, 1938].”
This 1894 amendment (N. Y. Const., art. XI, § 3) has its roots in the early history of the State and belongs to “ the long and intensive struggle for religious freedom in America”, which Justice Rutledge mentioned in his dissenting opinion in Everson v. Board of Educ. (330 U. S. 1, 33-34, supra) of which he said the First Amendment “ was the direct culmination.” Despite differences in phraseology, the object of both the First Amendment and this State amendment is to keep religion from being dominated by government and to prevent government from being dominated by pressure groups seeking to control it for the promotion of religion.
If the books to be purchased by Boards of Education and supplied to pupils of parochial schools Avere religious tracts, it is conceded that the statute would be unconstitutional. The mere circumstance that they would be loaned to the pupil rather than supplied directly to the school Avould not preserve its validity. The constitutionality of this enactment is sought to be sustained on the basis that the textbooks to be supplied are “ secular ” rather than “ religious ”. Counsel for respondents assume that the clause in the section Avhich states that they *122 “ shall be textbooks which are designated in any public, elementary or secondary schools in the state or are approved by any boards of education, trustees or other school authorities ’ ’ means that the same books that are furnished to children attending public schools shall be furnished children attending private schools. The language does not exactly say this but, even if it were so construed, that would not sustain its constitutionality. The difficulty is that there is no reliable standard by which secular and religious textbooks can be distinguished from each other. In his concurring opinion in McCollum v. Board of Educ. (333 U. S. 203, 235, supra) Justice Jackson observed that: “ Perhaps subjects such as mathematics, physics or chemistry are, or can be, completely secularized”, but he continued by pointing out (p. 236) that it is necessary even in “ preparation for a worldly life to Imow the roles that religion and religions have played ’ ’ in the story of mankind, and that it is impossible to teach music, architecture, painting, history or literature without verging upon the religious field. One of the most important reasons on account of which church communicants have chosen, with much financial sacrifice, to have their children taught in parochial schools, is that they have wanted them to be indoctrinated on these subjects with the church point of view. It would be too much to expect that were the church in control of public school instruction, textbooks would not be selected which present church interpretation of such historical, scientific or philosophic items, for example, as the Council of Trent, the Reformation, the Spanish Inquisition, the Encyclopedists, Astronomy (cf. Copernicus and Galileo), Evolution, Social Studies (e.g., birth control, divorce, abortion) or, to quote again from Justice Jackson in McCollum (supra, p. 236 ), “ even the New England effort to found ‘ a Church without a Bishop and a State without a King ’ * * * ”. The New Englanders succeeded, for a while, in creating one of the most absolute theocracies of all time. No doubt Jefferson and Madison had this in mind when they fashioned the First Amendment, as well as the grounds for rebellion of ‘[1] Recusants ” and “ Dissenters ” against the Church of England. “ It is too much to expect that mortals will teach subjects about which their contemporaries have passionate controversies with the detachment they may summon to teaching about remote subjects such *123 as Confucius or Mohammed. When instruction turns to proselyting and imparting knowledge becomes evangelism is, except in the crudest cases, a subtle inquiry.” (McCollum v. Board of Educ., 333 U. S. 203, 236, Jackson, J., concurring.)
This has the most direct bearing upon the point presently at issue. If it were not true, church members who are compelled by law to pay taxes for public schools would not feel constrained by conscience and discipline to support religious schools for their own children. If the state is to provide schoolbooks for instruction in “ secular ” fields, which have inseparable religious connotations, and parochial schools become increasingly dependent upon state money to provide textbooks, which are the life blood of education, this statute will create and foster a pressure to dominate the choosing of books that shall be used in the public schools (so that they may be used also in parochial schools) which will always be latent, and at certain times and places, irresistible, and, as action begets reaction, there will be an opposite tendency, equally dangerous, on the part of the state to dominate the church.
As in the case of a trustee (e.g., Matter of Hubbell, 302 N. Y. 246, 259), the motivation of a religious group may be of the best, and its sense of mission the most disinterested, and yet — unless we are to change our governmental philosophy — the fundamental law will not permit it to be placed in a position where its own interest depends upon eroding the principle of separation between church and state.
The tendency on the part of the state to dominate the church has been observed in every totalitarian country, and it is actually what the First Amendment and article XI (§ 3) of the State Constitution were designed to prevent. The writings of James Madison, in particular, indicate that his concern for the separation between church and state was that he believed it to be as much in the interest of religion as of government.
If there were some applicable standard by which secular and religious textbooks could be distinguished from each other, there would remain the question whether taxpayers’ money could be spent to buy necessaries for parochial schools, thus liberating funds to be spent upon more strictly religious objectives. We are not required now to determine the constitutionality of expenditures for school lunch programs, health and welfare *124 services, busing, or even scholarships in the case of higher education. Our present concern is solely with textbooks for children, which are at the heart of the educational process.
The order appealed from should be reversed and the order and judgment of the Supreme Court, Albany County, be reinstated.
Judges Burke, Bregan and Keating concur with Judge Scileppi; Judge Van Voorhis dissents and votes to reverse in a separate opinion in which Chief Judge Fule and Judge Breitel concur.
Order affirmed.