William B. Bkenbau, Jb., J.
This is a proceeding brought pursuant to article 78 of the Civil Practice Act by which the petitioner seeks an order directing the respondents to submit to him for inspection all of the school records of Ms son, Edward M. Van Allen.
The facts are not in dispute. Petitioner, prompted by word from certain members of the faculty of his son’s school to the effect that the boy was in need of psychological treatment and therapy, retained the services of a private physician, who, on October 14,1960, with the written authorization of the petitioner, wrote to the school psychologist requesting an abstract of the psychological findings. On October 31,1960 the school psychologist forwarded to the private physician a copy of a report written for the guidance of school personnel in connection with the student. In the meantime, on October 28, 1960, petitioner made a formal written demand upon the board that it direct the Superintendent of Schools to make all school records of his son available for his inspection, and on November 2,1960 the demand was refused.
In refusing to make these records available, the board outlined its policy to keep the parent informed as to the progress of Ms child through report cards, periodic private conferences with teachers, and, if requested, interpretations of the personal file of the child by qualified school personnel, again by the conference method. In short, the school board has offered full co-operation within the confines of its policy, but the petitioner, accusing the board of concealment for the purpose of covering *83 up the 1 ‘ incompetency of one or more taxpayer-paid school employees ”, wants not conferences, but the written records.
The nature of this proceeding is of some importance. While the writs of certiorari, mandamus and prohibition were abolished by the enactment of article 78 of the Civil Practice Act (Civ. Prac. Act, § 1283), the changes effected must be considered procedural and do not represent any substantial extension or contraction of the classic substantive principles underlying these ancient remedies. (Toscano v. McGoldrick, 300 N. Y. 156, 161, 162; Matter of Gimprich v. Board of Educ., 306 N. Y. 401, 406, 407.) The proceeding being one in the nature of a mandamus, the doctrine of exhaustion of administrative remedies does not apply (Matter of Leonard v. Horton, 278 App. Div. 62) and the court must determine merely whether or not the respondent was “specifically enjoined by law” (Civ. Prac. Act, § 1284, subd. 3) to permit the inspection of records. Equitable principles will control issuance of the court’s order. (Administrative Adjudication in the State of New York by Robert M. Benjamin [Report to Honorable Herbert H. Lehman, Governor of the State of New York, 1942], vol. I, p. 351 et seq.; Matter of Coombs v. Edwards, 280 N. Y. 361, 364; Matter of Andresen v. Rice, 277 N. Y. 271, 282; People ex rel. Desiderio v. Conolly, 238 N. Y. 326, 332, 333.)
A public body cannot be commanded to perform an act not authorized by the statute from which it derives its power (Matter of Wong v. Finkelstein, 299 N. Y. 205, 207) or other law. Such a mandate will be found, if at all, in the Constitution of the State of New York, the statutes of New York, the authorized regulations, rulings or orders of the Commissioner of Education of the State of New York promulgated by him pursuant to a valid exercise of the powers delegated to him by the Legislature, or in the great body of the common law. In the absence of such a rule of law, mandamus will not lie, since a petitioner must establish a clear, legal right to the relief which he seeks (Matter of Pruzan v. Valentine, 282 N. Y. 498, 501) to compel performance of the alleged duty (Matter of Coombs v. Edwards, supra).
The Constitution is silent. Nothing is contained in either article XI (“ Education ”) or in article I (“ Bill of Rights ”), which specifically touches upon the problem. It may be noted in passing, however, that section 1 of article I of the Constitution providing that “No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers ” has been construed not as a grant or a *84 source of rights, but as a shield against unwarranted interference with existing rights by any department of the government. (People ex rel. Gow v. Bingham, 57 Misc. 66, 69; Fidler v. Murphy, 203 Misc. 51, 53.)
We turn, then, to a consideration of the enactments of the State Legislature which might bear upon the problem presented. Although the Education Law of the State encompasses three volumes of McKinney’s Consolidated Laws, and while part III of article 3 lodges in the Division of History and Public Records of the Education Department the ultimate power of supervision, care, custody and control of all public records of all public offices, there is no legislative pronouncement in this body of statutes either granting to or taking away from a parent the right to inspect the school records of his or her child.
The Legislature has in many other contexts seen fit on the one hand to define what constitutes “public records” which are available to all persons for inspection (e.g., Education Law, § 144; Public Health Law, § 4174; General Municipal Law, § 35; Election Law, § 380; Judiciary Law, § 468; Civ. Prac. Act, §§ 382, 410, 414; or to persons or agencies having an interest (e.g., Public Officers Law, § 66-a; Domestic Relations Law, § 114; Tax Law, §§ 211, 384, 437; Stock Corporation Law, § 50; Insurance Law,' §§ 198, 370); and, on the other hand, to characterize certain other records as being confidential and not subject to inspection by the public or, indeed, by persons who might otherwise have a more particular interest in them (e.g., Banking Law, § 36, subd. 10; § 41, subd. 2; [former] Sanitary Code of City of New York, § 33 (see Matter of Bakers Mut. Ins. Co. [Dept. of Health], 301 N. Y. 21).
Section 51 of the General Municipal Law provides that “ All books of minutes, entry or account, and the books, bills, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any officer, board or commission acting for or on behalf of any county, town, village or municipal corporation in this state are hereby declared to be public records, and shall be open, subject to reasonable regulations to be prescribed by the officer having the custody thereof, to the inspection of any taxpayer.” (Italics supplied.) However, it has been specifically held that a school district is not a municipal corporation within the meaning of that section. (Schnepel v. Board of Educ. of City of Rochester, 302 N. Y. 94.)
The foregoing examples are by no means exhaustive of the legislative pronouncements both of New York State Legislature and of local municipal legislative bodies, but they are indicative of the broad underlying power of the Legislature to deal with' *85 the subject of records and their availability for inspection. Neither counsel nor the court has been able to discover any legislation dealing with the nature of the school records at issue here as being either “ public ” on the one hand, or “ confidential ’ ’ on the other, or of the right of a parent as distinguished from the public at large to inspect them.
We turn, then, to a consideration of the regulations, rulings and orders of the Commissioner of Education of the State of New York. There is little doubt that if the Commissioner has in fact regulated in this area, he is well within the powers delegated to him under section 4 of article V of the Constitution and section 305 of the Education Law. As the Court of Appeals pointed out in Bullock v. Cooley (225 N. Y. 566, 576-577) the object of the statute (Education Law) “is to make all matters pertaining to the general school system of the state within the authority and control of the department of education and to remove the same so far as practicable and possible from controversies in the courts” (emphasis supplied).
In determining whether the Commissioner has in fact regulated in this area, certain fundamentals must be recalled. First, the Commissioner of Education has power to enact regulations. Such regulations are construed as quasi-legislative acts which are for the regulation of all future cases and for the guidance of all administrative officers whose acts are subordinate to the regulatory authority. (See Matter of Hecht v. Monaghan, 307 N. Y. 461, 469; Nash v. Brooks [No. 1], 251 App. Div. 616, 618.) Such administrative regulations are to be distinguished from those pronouncements of an administrative officer which are quasi-judicial in character, and, therefore, only binding upon the particular parties litigant in whose case the officer made his decision.
Section 8 of article IV of the Constitution of the State of New York requires that rules or regulations of State administrative officers and agencies be filed in the office of the Department of State and shall not be effective until so filed. (See People v. Calabro, 7 Misc 2d 732.) Pursuant to this constitutional mandate, the Commissioner of Education has filed extensive regulations. encompassing 32 articles and over 250 sections, none of which deals with the right of inspection of school records other than section 205-2b, which provides that the minute books containing the minutes of the district meetings of the board of education of a union free school district shall be filed as a “ public record ”. Inspection aside, however, the Commissioner has regulated that it shall be the duty of the trustees and boards of education to maintain for each child cumulative records cover *86 ing the essential features of the health and physical education program, and that “health” as so used includes “mental hygiene”. (See Regulations, § 155, subd. 5; § 156, subd. 2-b.)
Subdivision 1 of section 159-b is also pertinent. It enumerates among the duties of trustees and boards of education the obligation: “(f) to keep the health records of individual children confidential except as such records may be necessary for the use of approved school personnel and, with the consent of the parents or guardians, for the use of appropriate health personnel of cooperating agencies.” (Italics supplied.)
Finally, in article XXIX of the Regulations providing for promotional increments for public school teachers, section 223 provides as follows: “ 1. A system for the recording of evidence in compliance with the standards and conditions [for promotional increments] shall be adopted in each school district. In accordance with such system, each school district shall maintain for each teacher confidential records adequate to support decisions with respect to granting of promotional increments. 2. Bach teacher’s confidential record shall be available to that teacher, to the board of education, to the superintendent, district superintendent and supervising principal and to persons giving direct supervision to the teacher.” (Italics supplied.)
Thus, it would appear that the Commissioner by regulations validly adopted has provided for the maintenance of mental health records of children and has further provided that they are confidential except with the consent of the parent. Unlike the specific confirmation of the rights of the teacher to see his or her own personal confidential record, the regulations are silent on the right of either the student or the parent to inspect the child’s records.
Turning from the regulations to the decisions of the Commissioner, we come to the Matter of the Appeal of Arthur T. Thibadeau, Jr. (No. 6849, decided by Ewald B. Nvquist, Acting Commissioner of Education, on September 22, 1960). That was an appeal by a member of the Board of Education of Union Free School District No. 5, of the Town of Hempstead, Nassau County (Levittown), from a directive of that local board to the effect that parents be permitted to inspect records of their children, including progress reports, subject grades, intelligence quotients, tests, achievement scores, medical records and psychological and psychiatric reports, selective guidance notes and the evaluations of students by educators.
As the decision is short, it may be quoted in full:
1 ‘ Although certain records of the kind here involved are privileged and confidential (see Ed-uc. Law § 7611, Civil Practice Act, *87 § 352), such privilege merely prevents the disclosure of the communication or record to third parties, i.e., to persons other than the parent and other than the person making the record. The ‘ client5 or ‘ patient ’ within the meaning of the provisions referred to is the child and, since the child is a minor, and cannot exercise full legal discretion, the parent or guardian of the child. The parent, as a matter of law, is entitled to such information. It should be noted, further, that the education interests of the pupil can best be served only by full cooperation between the school and the parents, based on a complete understanding of all available information by the parent as well as the school.
“It is, of course, to be understood that, at the time of the inspection of such records by the parent, appropriate personnel should be present where necessary to prevent any misinterpretation by the parent of the meaning of the record, since some of the records here in question may not be properly evaluated and understood by some parents. The resolution under review here contains provisions for such safeguarding procedure.
“ The appeal is dismissed.”
The argument has been advanced by the respondent, first, that the statement ‘ ‘ the parent as a matter of law is entitled to such information” is dicta and not necessary to the decision; and, second, that it merely provides for the imparting of “ information ” rather than the inspection of records. These contentions do not ring true. Taken in context, the 1 ‘ information ’ ’ referred to is to be given ‘ ‘ at the time of the inspection of such records ’ ’ and envisages something more and certainly nothing less than such an inspection; nor can the statement be considered purely as dicta, since it plainly affirms the position of the Acting Commissioner that he could not as a matter of law overrule the regulation of the Levittown School Board in respect to the very essence of the question appealed. It is also noted, however, that in upholding the resolution of the local board the Acting Commissioner emphasized that the resolution there appealed from contained provisions for safeguarding procedure. This court has not been given a copy of that resolution and is, therefore, unable to determine what those safeguarding provisions were. It may be assumed from a close reading of the opinion that they did not prevent the inspection of the records by the parents, but were confined to the presence of appropriate school personnel at the time of such inspection.
The difficulty with the decision arises not from any ambiguity in its meaning but from the question of its applicability to boards of education generally rather than solely to the parties who participated in the appeal, i.e., whether it has the force of a *88 quasi-legislative pronouncement or is essentially a quasi-judicial act affirming the resolution of the local board while recognizing the rights of similar local bodies to deal with the problem differently.
Of assistance in this connection is the official communication dated November 21, 1960 from Associate Commissioner of Education Crewson forwarded by the department to district superintendants of schools and supervising principals, and labeled ‘ ‘ Availability of Pupil Records to Parents ’ ’. This document was submitted to the court by counsel for the petitioner without objection, and in it the Associate Commissioner, referring to the TMbadeau case, characterized it as a “ judicial ” decision. This nomenclature was repeated in the opinion of Charles A. Brind, Esq., Counsel to the State Education Department, annexed to the above-enumerated document. At first blush, these references seem to indicate a departmental determination that the TMbadeau ruling did not have the force of a regulation. Moreover, it has been held in Gwynne v. Board of Educ. (259 N. Y. 191) that persons who have not participated in an appeal to the Commissioner of Education are not necessarily bound by the decision of the Commissioner, while those who did participate are bound. (See, also, Bramley v. Miller, 243 App. Div. 220.) These authorities also seem to confine the thrust of the TMbadeau decision to the parties before the Commissioner in that appeal.
Other considerations militate against this conclusion however. The nature of the question decided is manifestly one which calls for uniformity of application throughout the State rather than the diversity which would attend local determinations. Even the respondent Superintendent of Schools in this proceeding has agreed with the desirability of uniformity when he conceded in his affidavit that a clarification by the Commissioner “ # * * would be binding on all school districts and educators # * * ” (emphasis supplied). Moreover, it is stated in New York Jurisprudence (vol. 1, Administrative Law, § 99, p. 442): “ In some particular instances, at least in certain respects, the functioning of an administrative agency in the adoption of an order which is to operate generally in the nature of a statute may be practically the same as in the issuance of an order in the nature of a judgment or- decree which is to operate specifically against designated individuals.”
There can, therefore, be little doubt that we are in the precise area where regulations would be far preferable to quasi-judicial pronouncements by the Commissioner in a variety of appeals, *89 and it would appear that the Department of Education is in agreement, for in the amplification of the Thibadeau decision above referred to, which affirms in large measure the decision of Thibadeau, the department has undertaken to advise all school districts of the uniform policy to be adopted. Certain things are said in this directive, however, which may be taken to be a retreat from Thibadeau. Thus, it is stated: ‘ ‘ local boards of education may well adopt policies to determine the content and uses, with reasonable safeguards, of such records. * * * The decision does not mean that isolated bits of numerical data, such as, I.Q.’s and achievement scores, should be presented, bare of interpretation, to parents * * * it has been considered desirable practice to record observations separate from interpretations. If observations are carefully made and factually recorded, they should be helpful when used with parents * * *. Further, in order to prepare certain reports and summaries, school or referral agency staff members frequently make notes in terms of their reactions, speculations or observations. These notes often serve as personal memory-aids in expectation of later preparation of reports which are to become a part of the student’s record. Such notes ordinarily are not placed in the student’s file, but represent ideas which, when combined with findings from test materials and from other sources, aid in the preparation of the student’s records. These personal notes, unlike test materials and prepared reports, remain the work sheets or jottings of the teacher or other professional personnel involved ”. In sum, then, it would appear that the Commissioner has not formally regulated in this area, but has concluded that his policy should have uniform effect throughout the school districts of the State. Perhaps the answer lies in the concluding paragraph of the recent directive informing the school districts of the Commissioner’s plan to appoint a committee of consultants, including administrators, guidance personnel and school psychologists to advise concerning future communications on the matter. It may well be that through the efforts of such a committee, a formal quasi-legislative regulation may be adopted. Absent such formal regulation, however, the court would be reluctant to interpret the quasi-judicial decision in the Thibadeau case as being a law specifically enjoining the East Meadow School District, which was not a party to that appeal, to provide unlimited inspection of school records by a parent.
Since, then, neither the Constitution of the State, the statutes of the Legislature, nor the. quasi-legislative regulations of the Education Department, in and of themselves, afford a basis for *90 relief, we must turn to the rights of the petitioner, if any, under the common law.
At the outset, it might be recalled that thé function of education was traditionally performed by the parents and that only in more recent times was that function delegated or transferred to school authorities. Blackstone, in his commentaries on the common law of England, enumerated the duties of parents to children as consisting of three things: ‘1 their maintenance, their protection and their education.” (Italics supplied.) With respect to education, he stated, ‘ ‘ This duty is pointed out to the parent by reason, and is of the greatest importance.” (Blackstone’s Comm, [edited by Bernard C. davit, 1941], ch. XVI, Parent and Child, pp. 194-195. See, also, 2 Kent’s Comm., pp. 195-196.)
John Stuart Mill, in his essay ‘ ‘ On Liberty ’ ’ graphically portrayed both the strong right of the parent in this regard as recognized by the common law and his corresponding duty: “ It is in the case of children, that misapplied notions of liberty are a real obstacle to the fulfillment by the State of its duties. One would almost think that a man’s children were supposed to be literally, and not metaphorically, a part of himself, so jealous is opinion of the smallest interference of law with his absolute and exclusive control over them-, more jealous than of almost any interference with his own freedom of action: so much less do the generality of mankind value liberty than power. Consider, for example, the case of education. Is it not almost a self-evident axiom, that the State should require and compel the education, up to a certain standard, of every human being who is born its citizen? Yet who is there that is not afraid to recognize and assert this truth? Hardly any one indeed will deny that it is one of the most sacred duties of the parents (or, as law and usage now stand, the father), after summoning a human being into the world, to give to that being an education fitting him to perform his part well in life towards others and towards himself. But while this is unanimously declared to be the father’s duty, scarcely anybody, in this country, will bear to hear of obliging him to perform it. Instead of his being required to make any exertion or sacrifice for securing education to his child, it is left to his choice to accept it or not when it is provided gratis! It still remains unrecognised, that to bring a child into existence without a fair prospect of being able, not only to provide food for its body, but instruction and training for its mind, is a moral crime, both against the unfortunate offspring and against society; and that if the parent does not fulfil this obligation, the State ought to see it fulfilled, at the charge, as far as *91 possible, of the parent.” (Essay On Liberty, John Stuart Mill, ch. 5; italics supplied.)
The adoption of compulsory education in New York State, while alleviating some of the evils alluded to by Mr. Mill, has not, it would seem, thereby deprived a parent of his natural rights in the vital area of the education of his child. The history of the law is set out at length in Judd v. Board of Educ. (278 N. Y. 200) and it was there noted that (p. 211) “ the State has no desire to and could not if it so wished compel children to attend the free public common schools when their parents desire to send them to parochial schools (Pierce v. Society of Sisters, 268 U. S. 510) ”. Moreover, the right of parents to see to the education of their child is so strong that if they give adequate instruction at home the child cannot be compelled to attend any school. (People v. Turner, 277 App. Div. 317.) As the court stated in Pierce v. Society of Sisters (268 U. S. 510, 535): “ The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.”
In determining the means available to a parent to exercise this right and to discharge this duty by keeping abreast of the child’s development and advancement, the general common-law principles concerning the right of inspection of records are of assistance. In applying these principles it serves no useful purpose to enter into the classification of school records of pupils as being 11 public records ” or “ private records ”. Public they are, from the standpoint that the school district itself is a body corporate (Judd v. Board of Educ., supra; Matter of Engel v. Vitale, 18 Misc 2d 659, 667) supported by taxes paid by the public (Education Law, art. 71); and from the fact that the Commissioner himself in article XIY of his regulations has denominated them as among those records of public corporations which cannot be destroyed without his consent, the source of his authority to enact such a regulation stemming from section 147 of the Education Law which itself deals with public records. Private they are, from the standpoint that the Commissioner has labeled certain of them confidential except “ with the consent of the parent. ■ ’ (Regulations of Commissioner of Education, § 159-b, subd. 1-f.)
Petitioner’s rights, if any, stem not from his status as taxpayer seeking to review the records of a public corporation, but from his relationship with the school authorities as a parent who under compulsory education has delegated to them the educational authority over his child. Thus, the common-law rule recognized in Matter of Egan (205 N. Y. 147) to the effect that *92 when not detrimental to the. public interest, the right to inspect records of a public nature exists as to persons who have sufficient interest in the subject matter, is a guide.
It was more recently held in Matter of Stenstrom v. Harnett (131 Misc. 75, affd. 224 App. Div. 127, affd. 249 N. Y. 606) that although a record was not strictly speaking a public record, and although no statute specified those who were or were not entitled to inspect it, the fact that the record was required by law to be kept by a public officer, entitled a person with an interest in it to inspect the record. The ‘ ‘ interest ’ ’ there protected, was that of an administratrix of the estate of a person killed in an automobile accident. The court held her entitled to inspect a record of the accident filed in the office of the Bureau of Motor Vehicles.
All of the factors which prompted the court to issue a mandamus in that case are present in the case at bar. The records here sought to be inspected are not, strictly speaking, public records. No statute exists which specifies those who are and those who are not entitled to inspect them. As has been noted above, the records are required by law to be kept, and it has been held that members and officers of local boards of education are public officers within the definition contained in section 2 of the Public Officers Law. (Metzer v. Swift, 258 N. Y. 440.) It needs no further citation of authority to recognize the obvious “ interest ’’which a parent has in the school records of his child. We are, therefore, constrained to hold as a matter of law that the parent is entitled to inspect the records.
This is in accord with the common-law right of a patient to inspect his own hospital records (Matter of Glazer v. Department of Hospitals, 2 Misc 2d 207); of a client to be given open and frank information by his attorney as to the state of his business (Matter of Clay, 256 App. Div. 528), and to be given his attorney’s file upon posting proper security for the retaining lien (Leviten v. Sandbank, 291 N. Y. 352); of a stockholder to inspect the records of his corporation (Matter of Steinway, 159 N. Y. 250); and, indeed, of a member of a board of education to inspect records compiled by the superintendent of his own school district (Matter of King v. Ambellan, 12 Misc 2d 333).
Moreover, it accords with the policy of the Commissioner of Education of the State of New York as expressed in the Thibadeau ruling and as assumed in his regulation establishing the records as confidential except 1 ‘ with the consent of the parent”.
Amicus curiae, briefs were submitted by the New York State Psychological Association, Inc., and the New York State *93 Teacher,s Association. These briefs were carefully considered, but addressed themselves essentially to matters outside the realm of judicial determination. Thus, powerful arguments were made concerning the need for safeguards preventing misinterpretation by the parents of records of a highly professional and technical nature, the desirability of preserving the professional freedom of expression of psychologists and other teachers, uninhibited by fears of libel suits and parental retaliation, and the dangers of affording the parents material of a nature critical of the home environment of the child. It need only be noted in passing that there are equally powerful answers to these arguments. The important consideration to be remembered is that it is not the function of the court to write regulations or enact statutes. In the final analysis, the determination of these arguments rests either with the Legislature or the Commissioner of Education to whom the Legislature has delegated broad power to act. (See Matter of Board of Educ. of City of New York v. Allen, 6 N Y 2d 127.)
The court merely holds here that, absent constitutional, legislative or administrative permission or prohibition, a parent is entitled to inspect the records of his child maintained by the school authorities as required by law. The petition is accordingly granted.