405 A.2d 16.

MEMBERS OF THE JAMESTOWN SCHOOL COMMITTEE *et al.*
*vs.* DR. THOMAS C. SCHMIDT *et al.*

AUGUST 15, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.   The United States District Court for the District of Rhode Island has certified for our resolution[1] three questions concerning G.L. 1956, §§16-21.1-1, -2, -3 (Supp. 1978) (hereinafter referred to as the act). This statute provides a program for busing pupils to schools not within the limits of the city or town in which the students reside. The plaintiffs, both individually as taxpayers of their towns and collectively as members of the School Committees of Jamestown and Charlestown, brought an action in the Federal District Court against the Commissioner of Education (the commissioner) and other state defendants, seeking a declaratory judgment that the act violates both the State and Federal Constitutions and an injunction against administration of the statute. The following questions were certified:

1. Does the act violate article XII of the Rhode Island Constitution?

2. Does the act violate article IV, section 2 of the Rhode Island Constitution?

3. Can the act be fairly construed to avoid federal constitutional infirmities?

Before addressing the certified questions, we note that while the Federal District Court has the fundamental obligation to determine whether the act violates the Federal Constitution, the function of this court is to construe the act[2] and to decide whether it contravenes the Rhode Island Constitution. Nowak, Rotunda, Young, *Handbook on Constitutional Law* 21 (1978).

---

[1]The Federal District Court certified these questions pursuant to R.I. Sup. Ct. Rule 6.

[2]General Laws 1956, §§16-21.1-1, -2, -3 read as follows:

"16-21.1-1. General Purposes. — This chapter shall be construed and applied to create a state plan for the busing of pupils beyond city or town limits, in recognition of the legislative policy to encourage the establishment of and continuance of consolidated and regional schools, to provide a unified

The General Assembly has divided Rhode Island into five transportation districts. Section 16-21.1-2. The act further provides that students, whether they attend public schools or nonpublic, nonprofit, regionalized or consolidated schools, shall be transported to school by bus in two instances. First, a student who both resides in and attends school in the same transportation district receives transportation. Section 16-21.1-2. Second, under certain conditions, a pupil who attends a school outside the trasnportation region in which he resides, but within 15 miles of his residence, may obtain busing services by acquiring a variance from the commissioner. The latter provision is predicated upon findings by the commissioner that no similar school exists within the region in which the pupil resides and that bus transportation is necessary to enable the student to enjoy an educational opportunity that is rightfully his or hers to pursue. Only upon making such findings may the commissioner grant a variance requiring a city or town to provide bus transportation. Section 16-21.1-3.

---

statewide busing service, to afford to pupils who attend public schools the opportunity at the election of the school committee of the city or town in which the pupils reside, to attend a public school, either full time or part time, outside of the city or town which provides a program or curriculum not available within the city or town in which the pupil resides, as authorized by §16-3.1-1, et seq, to afford to handicapped children equal educational opportunity, to afford bus transportation to pupils who attend non-public non-profit schools which are consolidated, regionalized or otherwise established to serve residents of a specific area within the state, and who may be counted for purposes [of] reimbursement to cities and towns under the state aid formula provided by §16-7-22, et seq, to conserve valuable natural resources by reducing the number of vehicles necessary to transport pupils to school, and, to provide for the transportation of public school students who attend schools located outside of the city or town in which they reside, to protect the health, safety and welfare of pupils who live at such distances from the schools which they attend as to make it impractical or hazardous to require the pupil to walk to school."

"16-21.1-2. School bus districts established. — There are hereby established school bus districts within the state to provide bus transportation in the interest of public safety, health and welfare for pupils in grades kindergarten through grade twelve (12), or in special education programs, who attend public schools, including vocational schools and special education programs provided in accord with regulations of the Rhode Island state board of regents for education, consolidated schools established under

I

The plaintiffs contend that the act violates article XII of the Rhode Island Constitution by diverting tax dollars appropriated for the support of public schools to the transportation of students enrolled in nonpublic schools. The relevant sections of article XII are as follows:

"§1. Duty of general assembly. — The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which

---

the provisions of [§16-10-1], regional schools established under the provisions of §16-10-1, et seq, or who participate in cooperative programs as provided by §16-3.1-1, et seq, and non-public non-profit schools which are consolidated, regionalized or otherwise established to serve residents of a specific area within the state which schools satisfy the requirements of law for any of the grades of school, kindergarten through grade twelve (12), as follows:

"Region I The towns of Burrillville, North Smithfield, and Cumberland, and the city of Woonsocket

"Region II The county of Kent, except the town of West Greenwich and the towns of Foster, Glocester and Scituate

"Region III The towns of Lincoln, Smithfield, Johnston, North Providence, Barrington, Warren and Bristol and the cities of Cranston, Central Falls, East Providence, Pawtucket and Providence

"Region IV The county of Washington and the towns of Jamestown and West Greenwich

"Region V The towns of Little Compton, Middletown, Portsmouth and Tiverton and the city of Newport

"A pupil attending a school, including a public school, vocational school, special education program provided in accord with regulations of the Rhode Island state board of regents for education, a consolidated school established under the provisions of §16-10-1, et seq, a regional school established under the provisions of §16-3-1, et seq, as authorized by §16-3.1-1, et seq, or a non-public non-profit school kindergarten through grade twelve (12), consolidated, regionalized or otherwise established to serve residents of a specific area within the state for any of the grades of schools, kindergarten through grade twelve (12), in the interest of public safety, health and welfare, shall be provided with bus transportation to the school of facility which the pupil attends, within the region in which the pupil resides, by the

they may deem necessary and proper to secure to the people the advantages and opportunities of education.

"§2. Permanent school fund. — The money which now is or which may hereafter be appropriated by law for the establishment of a permanent fund for the support of public schools, shall be securely invested, and remain a perpetual fund for that purpose.

\* \* \*

"§4. Implementation of article — Diversion of funds. — The general assembly shall make all necessary provisions by law for carrying this article into effect. They shall not divert said money or fund from the aforesaid uses, nor borrow, appropriate, or use the same, or any part thereof, for any other purpose, under any pretence whatsoever."

The plaintiffs note the clear mandate in section 2 of article XII that the permanent school fund be applied specifically for the support of public schools and interpret section 4 in conjunction with section 1 of the same article as prohibiting the diversion of funds from the support of public schools to the promotion of private schools. Typical of what plaintiffs perceive as an unconstitutional diversion of funds is the allocation of money for the purpose of transporting students by publicly funded buses to private schools.

---

school committee of the city or town within which the pupil resides.

"16-21.1-3. Variances permitted. — Variances to require a city or town to provide bus transportation to a pupil who attends a school, except a special education facility, outside the region in which the pupil resides shall be granted by the commissioner of education if he finds that there is no similar school within the region, that such transportation is necessary to provide an educational opportunity which the pupil has a right to pursue, and that the school building which the pupil attends is within fifteen (15) miles of the city or town of which the pupil is a resident.

"Variances to require a city or town to provide bus transportation to a pupil entitled to enrollment [in] a special education program, provided in accord with regulations of the Rhode Island state board of regents for education, shall be granted by the commissioner of education if he finds that such transportation is necessary in order that the pupil enroll in a special education facility located outside of the region and there is no similar facility within the region."

At the outset we note that this court must construe a duly enacted statute to be constitutional if such a construction is reasonably possible. *State* v. *Authelet,* 120 R.I. 42, 46, 385 A.2d 642, 647 (1978); *J.M. Mills, Inc.* v. *Murphy,* 116 R.I. 54, 71, 352 A.2d 661, 670 (1976). Before we decide whether the act corresponds to the intent of the constitutional framers, we shall first seek to glean that intention from the language in section 1 of article XII.

The text of article XII, section 1 is facially ambiguous. It is unclear whether the duties of the General Assembly "to secure to the people the advantages and opportunities of education" was intended by the constitutional framers to be limited to public education. If we apply the maxim *noscitur a sociis*[3] to this language, then the word "education" would be read in light of the less comprehensive idea "public education." *See Commonwealth* v. *Baker,* 368 Mass. 58, 68, 330 N.E.2d 794, 800 (1975); *Deignan* v. *Cowan Plastic Products Corp.,* 99 R.I. 193, 196, 206 A.2d 534, 536 (1965). *See also* 2A Sutherland, *Statutory Construction* §47.16 at D01 (4th ed. Sands 1973). As a result, the word "education" is qualified by the word "public" and all the duties of the General Assembly would be read as bounded by the domain of public education.

On the other hand, section 1 is worded in the conjunctive:

> "it shall be the duty of the general assembly to promote public schools, *and* to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education." (Emphasis added.)

Generally, the conjunctive "and" should not be considered as the equivalent of the disjunctive "or." *See Earle* v. *Zoning Board of Review,* 96 R.I. 321, 324, 191 A.2d 161, 163 (1963). Use of the conjunctive implies separate, as opposed to

---

[3]This doctrine permits the meaning of doubtful words to be discovered by reference to their association with other associated words and phrases. *See* 2A Sutherland, *Statutory Construction* §47.16 at 101 (4th ed. Sands 1973). The meaning of general words is limited by that of the more specific words. *Id.*

dependent, duties. *See* 1A Sutherland, *Statutory Construction* §21.14 at 90-91 (4th ed. Sands 1972). Therefore, we could interpret the duty of the General Assembly to promote public schools as entirely independent of its duty to adopt all means necessary and proper to secure to the people the advantages and opportunities of education. Because both interpretations of article XII, section 1 are equally viable, we choose to view the constitutional mandate of that section in broad terms and hold that the right of the General Assembly to bus students is not limited to public-school pupils for the reasons set forth below.

State courts have diverged on whether school-busing legislation violates their state constitutions. A minority of courts, relying on now-defunct precedent, has held that it is not constitutional for states to use public funds to implement a statute providing for the transportation of nonpublic-school students. *See, e.g., Matthews* v. *Quinton,* 362 P.2d 932 (Alaska 1961); *Opinion of the Justices,* 59 Del. 196, 216 A.2d 668 (1966); *Spears* v. *Honda,* 51 Haw. 1, 449 P.2d 130 (1968); *Epeldi* v. *Engelking,* 94 Idaho 390, 488 P.2d 860 (1971); *Board of Education* v. *Antone,* 384 P.2d 911 (Okla. 1963); *Gurney* v. *Ferguson,* 190 Okla. 254, 122 P.2d 1002 (1942); *Visser* v. *Nooksack Valley School District No. 506,* 33 Wash. 2d 699, 207 P.2d 198 (1949); *State ex el. Reynolds* v. *Nusbaum,* 17 Wis. 2d 148, 115 N.W.2d 761 (1962). In so ruling, these courts relied on the reasoning of the New York Court of Appeals in *Judd* v. *Board of Education,* 278 N.Y. 200, 15 N.E.2d 576 (1938), which held that nonpublic-school busing is an indirect contribution made in aid of the maintenance and support of private schools. *Id.* at 211-12, 15 N.E.2d at 582. Approximately thirty years later, however, the New York court expressly overruled *Judd* in *Board of Education* v. *Allen,* 20 N.Y. 2d 109, 115, 228 N.E.2d 791, 794, 281 N.Y.S. 2d 799, 803 (1967), *aff'd* in *Board of Education* v. *Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), thereby weakening the impact of cases premised on *Judd.*

A growing number of jurisdictions, however, adopting what is commonly referred to as the child-benefit theory, has rejected the view that legislation permitting busing to nonpublic schools, thus contributing indirectly to the maintenance and support of those schools, is constitutionally infirm. *See e.g., Bowker* v. *Baker,* 73 Cal. App. 2d 653, 663, 167 P.2d 256, 261 (1946); *Snyder* v. *Town of Newtown,* 147 Conn. 374, 391, 161 A.2d 770, 777 (1960); *Board of Education* v. *Bakalis,* 54 Ill. 2d 448, 461, 299 N.E.2d 737, 743 (1973); *Nichols* v. *Henry,* 301 Ky. 434, 439, 191 S.W.2d 930, 932 (1945); *Bloom* v. *School Committee,* 376 Mass. 35, 47, 379 N.E.2d 578, 585 (1978); *Rhoades* v. *Abington Township School District,* 424 Pa. 202, 220, 226 A.2d 53, 64 (1967); *State ex rel. Hughes* v. *Board of Education,* 154 W.Va. 107, 121-22, 174 S.E.2d 711, 720 (1970). Under this theory, transportation of pupils is viewed as a legitimate function of the governmental police power to protect the health and safety of all students who are compelled by law to attend school. In order to fall within this theory, however, the benefit must reach children attending public as well as private schools. Note, *Lemon* v. *Kurtzman,* 403 U.S. 602 (1971); *Tilton* v. *Richardson,* 403 U.S. 672 (1971), 4 Conn. L. Rev. 541, 542 (1971-72). Although private schools arguably receive some benefit in having pupils bused to their doors at state expense, courts acceding to the child-benefit theory have consistently held that any aid derived by private schools because their students receive bus transportation is incidental to the direct benefit enjoyed by the pupils themselves.

Use of the police power to further the well-being of private-school children by providing bus transportation has been analogized to police and fire-department protection of nonpublic-school occupants and nonpublic-school buildings. *See Everson* v. *Board of Education,* 330 U.S. 1, 17, 67 S.Ct. 504, 512, 91 L.Ed. 711, 724 (1947); *Bowker* v. *Baker,* 73 Cal. App. 2d 653, 660, 167 P.2d 256, 262-63 (1946); *State ex rel. Hughes* v. *Board of Education,* 154 W.Va. at 118-19, 174 S.E.2d at 718-19 (1970). Each of these protective services

constitutes a public expenditure of money that indirectly benefits private schools. In view of the purpose of the act, which is to protect the health, safety and welfare of Rhode Island pupils, we agree that providing bus transportation to students is a legitimate exercise of the police power. Safety is a religiously neutral concept; revenues expended to ensure the health, safety and welfare of all school children are spent for a public purpose. The fact that the act answers the needs of both private- and public-school children does not necessitate the conclusion that the Legislature has erroneously appraised the public need. *See Everson* v. *Board of Education,* 330 U.S. at 6, 67 S.Ct. at 507, 91 L.Ed. at 718.

Indeed, the General Assembly is merely responding to the dictates of the mandatory education law, §§16-19-1 to -9, by enabling all citizens to comply easily and safely with that law. *See State ex rel. Hughes* v. *Board of Education,* 154 W.Va. at 117, 174 S.E.2d at 718. In a sense, busing is a tool for enforcing the duty of compulsory education of minor children that states place upon parents. *See Board of Education* v. *Wheat,* 174 Md. 314, 322-23, 199 A.628, 631-32 (1938); *Alexander* v. *Bartlett,* 14 Mich. App. 177, 182, 165 N.W.2d 445, 448 (1968). The United States Supreme Court has held that parents, acting under a state compulsory-education law, may send their children to state-approved religious schools. *See Pierce* v. *Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L. Ed. 1070 (1925). We would thus be fostering an anomaly if we held that the state is only obligated under article XII to assist those parents who choose public over private schools, particularly when compliance with the duty to educate children may result in danger to the health or safety of school children who would otherwise oftentimes be forced to confront on foot or on bicycles the hazards of traffic or of inclement weather. *See Rhoades* v. *Abington Township School District,* 424 Pa. 202, 206-07, 226 A.2d 53, 56-57 (1967). *See also Alexander* v. *Bartlett,* 14 Mich. App. at 181, 165 N.W.2d at 447-48. Although the language of article XII, which does not specifically prohibit the use of public funds for the support of private schools,

distinguishes the situation under our review from that of the courts cited above, we believe that the rationale behind the child-benefit theory pertains to the framers' intent behind article XII. Pursuant to the second clause in section 1 of article XII, the state has the obligation "to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education." Because we perceive the ultimate goal of article XII to be education in general, we therefore hold that article XII, section 1 permits the state to utilize its police powers by assisting all parents who must comply with the compulsory education law, notwithstanding the fact that they may have exercised their constitutional right to choose a religious, rather than a public institution, as allowed in *Pierce* v. *Society of Sisters, supra.*

The California Supreme Court has similarly interpreted its constitution and busing statute. Article IX, section 1 of the California Constitution,[4] which refers to the diffusion of knowledge as essential to the preservation of liberty, is substantially similar to article XII, section 1 of the Rhode Island Constitution. *See Bowker* v. *Baker,* 73 Cal. App. 2d 653, 167 P.2d 256 (1946). The California court held that its busing statute, which permitted private-school student busing along established public-school bus routes, was validly designed to effectuate the ideal of education for a self-governing people embodied in the California Constitution. *See id.* at 664-67, 167 P.2d at 261-63. *See also Alexander* v. *Bartlett,* 14 Mich. App. 177, 181, 165 N.W.2d 445, 447 (1968).

---

[4]Article IX, section 1 of the California Constitution states:

"A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

Our holding is further buttressed by the fact that the United States Supreme Court, applying the child-benefit theory, found an analogous state busing statute to be constitutional under the First Amendment. *See Everson* v. *Board of Education,* 330 U.S. 1, 16-18, 67 S.Ct. 504, 511-13, 91 L. Ed. 711, 723-25 (1947). Mr. Justice Black, writing for the majority, approved the New Jersey busing statute as a general program that neutrally benefits all citizens without regard to their religious beliefs. *See id.* at 18, 67 S.Ct. at 513, 91 L. Ed. at 725.[5]

In contrast with section 1, section 2 of article XII unambiguously declares that funds belonging to the permanent school fund must be used solely for the support of public schools. On its face the act is constitutional notwithstanding the provisions of section 2 because it does not mandate utilization of the permanent school fund in order to bus private school children. In implementing the act, the Legislature can appropriate money into a fund other than the permanent school fund for the purpose of busing school children. Therefore, busing need not depend on money from the section 2 fund. If this fund were diminished for the benefit of nonpublic school student transportation, however, implementation of the act would be in violation of section 2. In this regard we note that the record indicates that the permanent school fund has never been depleted for the costs of the school busing program of the act. Henry W. Stevenson, Jr., the Assistant Commissioner of Education, who is in charge of the office of Educational Finance, has indicated in his affidavit that funds used for the act's busing program are obtained from local revenues and sources other than the permanent school fund of section 2. Assuming that

---

[5]The New Jersey situation is distinguishable from that of Rhode Island in one main respect. In New Jersey, a township board of education, acting pursuant to the busing statute, authorized reimbursing the money expended by parents for their children's bus transportation by regular buses operated by the public transportation system. Mr. Justice Jackson, dissenting, noted that this system does not furnish transportation to school students, but only gives tax funds in the form of reimbursement to parents. Therefore, he claimed, the safety of the pupils remains unaffected. *Everson* v. *Board of Education,* 330 U.S. 1, 19-20, 67 S.Ct. 504, 513-14, 91 L. Ed. 711, 725-26 (1947).

the Federal District Court finds as a fact that the section 2 fund is not being utilized to further the goals of the act, we also hold that in practice the act does not contravene section 2 of article XII. Other state courts interpreting constitutional provisions similar to article XII, section 2, have upheld their busing statutes when the costs for busing to private schools were not paid out of the permanent school fund. *See, e.g., Bowker v. Baker*, 73 Cal. App. 2d 653, 658, 167 P.2d 256, 258 (1946); *Nichols v. Henry*, 301 Ky. 434, 444, 191 S.W.2d 930, 935 (1945).

We next examine whether the act is an appropriate example of legislative authority pursuant to section 4 of article XII. The plaintiffs suggest that in so doing we should read the present version of section 4 in light of the 1841 draft of section 4, which is as follows:

> "Sec. 4. The General Assembly shall make all the necessary provisions by law for carrying this Article into effect. They shall direct the application of the interest arising from said fund; but no law shall ever be passed authorizing said fund or *any money appropriated to education* or any part thereof, or the interest thereon, to be borrowed; or *to be diverted or appropriated to any other use than the support of Public Schools* in this State." (Emphasis added.)

Such a reading, they argue, leads to the conclusion that section 4 as adopted also prohibits appropriations for busing students to other than public schools. The current version of section 4[6] contains no admonition against using "any money appropriated to education * * * [for] the support of Public Schools * * *." Instead, it merely prohibits the use of the permanent school fund for purposes other than those specified in section 2. Furthermore, coupled with this prohibition

---

[6]Section 4 reads as follows:

> "The general assembly shall make all necessary provisions by law for carrying this article into effect. They shall not divert said money or fund from the aforesaid uses, nor borrow, appropriate, or use the same, or any part thereof, for any other purpose, under any pretence whatsoever."

is the mandate that "[t]he general assembly shall make all necessary provisions by law for carrying this article into effect."

We do not adopt plaintiffs' interpretation of section 4. Rather, assuming *arguendo* that the framers had ratified the 1841 draft version of section 4, it appears not to be in harmony with section 1,[7] which imposes on the General Assembly the duty "to secure to the people the advantages and opportunities of education," as well as the duty to promote public schools. Section 4 as adopted, however, aligns with what this court perceives as the intent of the framers manifested in section 1. As in section 1, in section 4 the General Assembly has two separate duties. One duty is to apply the permanent school fund created by section 2 only for the purpose described in that section, namely, for the support of public schools. In response to its second responsibility, which is to facilitate the "diffusion of knowledge" and "to secure to the people the advantages and opportunities of education," the General Assembly enacted the act. The act heralds a general program for the transportation of school children and requires a neutral stance in allotting state police-power benefits among all students of Rhode Island. For these reasons, we hold that the act comports with the intent of article XII of the Rhode Island Constitution.

## II

The second question certified to this court is whether the act violates article IV, section 2 of the Rhode Island Constitution. Article IV, section 2 reads as follows:

---

[7]Section 1 reads, in pertinent part, as follows:

"it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education."

"§2. Power in general assembly — Enactment and style of law. — The legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly. The concurrence of the two houses shall be necessary to the enactment of laws. The style of their laws shall be, It is enacted, by the general assembly as follows: * * *"

The plaintiffs argue that the act is an unreasonable delegation of legislative authority as we interpreted that phrase in *Jennings* v. *Exeter-West Greenwich Regional School District Committee*, 116 R.I. 90, 352 A.2d 634 (1976). Relying on *Jennings*, plaintiffs contend that the act is so devoid of legislative standards and safeguards that people of ordinary intelligence are unable to determine who designates which private schools will be regionalized. The plaintiffs further assert that there are no guidelines to determine whether more than one private regional school may serve the same area and whether a private school has been "otherwise established to serve residents of a specific area within the state * * *."

In *Jennings* we stated that the nondelegation doctrine prohibits only unreasonable delegations of legislative power, *id.* at 97-98, 352 A.2d at 638, *citing City of Warwick* v. *Warwick Regular Firemen's Association*, 106 R.I. 109, 113, 256 A.2d 206, 209 (1969), and established two prerequisites to a valid delegation. First, the General Assembly must have dealt with the fundamental issues of policy inherent in the legislation. Second, the Legislature (delegator) may delegate power to a private body (delegatee) only when legislative standards and safeguards adequately circumscribe the exercise of that power. Compliance with these guidelines is necessary to protect the public from arbitrary or self-interested actions on the part of the private-body delegatee. *Jennings* v. *Exeter-West Greenwich Regional School District Committee*, 116 R.I. at 98, 352 A.2d at 638-39.

In *Jennings* we found that the previous busing statute, G.L. 1956 (1969 Reenactment) §16-21-2, contained no legislative standards because it did not limit the circumstances in which a school could declare that it served a specific geographical area and thus become entitled to transportation services. *Id.* at 98, 352 A.2d at 639. Moreover, that statute did not place limits on the size of the area that a private school could decide to service. In effect, the schools themselves could determine not only which townships had to provide busing, but also how far students were to be bused. *Id.*

We also held in *Jennings* that the statute lacked adequate safeguards against abuse because it permitted private schools to act in their own self-interest by regionalizing or expanding their present territories. The schools could thereby pass their transportation costs on to public-school districts. *Id.* at 100, 352 A.2d at 640. Responding to *Jennings*, the Legislature amended the busing statute in an effort to avoid the above infirmities.

In compliance with the first prong of the *Jennings* test, the General Assembly has outlined the fundamental policy considerations inherent in the legislation. Furthermore, by establishing five school districts and a variance procedure, the General Assembly has carefully circumscribed the interest that private schools may have in expanding for purposes of transportation. *See* §§16-21.1-1, -2, and -3. In contrast with the situation in *Jennings*, under the present statute the duty of any particular city or town to bus students to any school, no matter how unique the program of that school may be, is extinguished at the point where the transportation district ends, or, in the event of a variance, at a distance of 15 miles from the city or town in which the pupil resides. The General Assembly, not the schools, has divided the service areas into five transportation districts, the limits of which may be ignored only by the commissioner in the exercise of his authority to issue variances where the necessary conditions are met. Unlike the situation in *Jennings*, even though a nonpublic school may control its

territorial service area, it can only expect to receive transportation for its students within the geographic parameters established by the General Assembly. And, as noted by defendants in their brief, use of a statute to the extent allowed by the Legislature does not constitute selfish abuse of that statute. Because the Legislature has recited the policy considerations relative to the act and has provided adequate safeguards and standards for implementation of those sections, we hold that the act now conforms to the law enunciated in *Jennings* and therefore does not violate article IV, section 2, of the Rhode Island Constitution.

## III

The third question presented to us for our consideration is whether the act can be fairly construed to avoid federal constitutional infirmities. As we noted above, however, our duty, unlike that of the Federal District Court, is not to render a decision on the federal constitutional claim. In attempting to answer the above question, we find ourselves teetering on the brink of addressing and deciding whether the act violates the First Amendment to the Federal Constitution. Because the Federal District Court did not request our interpretation of specific statutory language, we respectfully refrain from answering this question. *See, e.g., Bellotti* v. *Baird,* 428 U.S. 132, 146-47, 96 S.Ct. 2857, 2866, 49 L. Ed.2d 844, 855 (1976); *Baird* v. *Attorney General,* 371 Mass. 741, 745, 360 N.E.2d 288, 291 (1977).

We thus answer the first two certified questions in the negative: the act does not violate either article XII or article IV, section 2, of the Rhode Island Constitution.

Mr. Justice Kelleher, with whom Mr. Justice Joslin joins, concurring. In advising the Federal District Court as to the reach of art. XII, I believe that, rather than relying on canons of statutory construction, we must effectuate the intent of the makers of the constitution by looking at the history of the time and examining the state of things existing when the constitution was framed and adopted, having in mind the mischief that was to be remedied. *Bailey* v. *Baronian,* 120 R.I. 389, 392, 394 A.2d 1338, 1339 (1978). Consequently,

we must take a look at what were the educational concerns in Rhode Island at the turn of the nineteenth century and what transpired in the General Assembly during the 40 or so odd years preceding the adoption of our constitution in 1842.

During the seventeenth and eighteenth centuries, Rhode Island schools were private enterprises assisted and aided by the towns but supported by fees charged to those who attended them. While municipal governments acknowledged an obligation to assist schools, it was assumed that the primary responsibility for educating children rested with the parents, the families, and other interested individuals. By the end of the eighteenth century, most towns had provided enough assistance to insure the operation of at least one or more fee-charging schools in their areas. Many Rhode Islanders were reluctant to accept the idea of tax-supported free schools.

At this point in time, Rhode Island's social structure was composed of three groups: plantation owners and country merchants; artisans and shopkeepers, who by the mid-1700's had become a part of an emerging class of mechanics and small manufacturers; and farmers. The merchants and plantation owners, having possessed the necessary wherewithal, could send their children to private schools; the artisans and shopkeepers lacked the wealth to afford private education and could not muster sufficient clout which would guarantee the enactment of free-school legislation; and the farmers opposed free schools as an unnecessary tax burden because they viewed the education then being provided as being totally unrelated to their needs.

In 1795 John Howland spearheaded the movement to establish free schools. At that time he was a member of the Providence Association of Mechanics and Manufacturers. Subsequently, in February 1799, the association, through a special committee composed of Howland and such other individuals as Joel Metcalf, Peter Grinnell, and Samuel Thurber, Jr., petitioned the General Assembly and listed four reasons why the assembly should make "legal provision for the establishment of Free Schools sufficient to educate all the children * * * through the state." The reasons were:

"That the means of education which are enjoyed in this state, are very inadequate to a purpose so highly important; That numbers of the rising generation, whom nature has liberally endowed, are suffered to grow up in ignorance, when a common education would qualify them to act their parts in life with advantage to the public, and reputation to themselves; That in consequence of there being no legal provision for the establishment of schools, and for the want of public attention and encouragement, this so essential a part of our social duty is left to the partial patronage of individuals, whose cares cannot extend beyond the limits of their own families, while numbers in every part of the state are deprived of a privilege which it is the common right of every child to enjoy; * * * That liberty and security, under a republican form of government, depend on a general diffusion of knowledge among the people."

The association's petition was referred to committee, and in a report submitted in June 1799 the committee acknowledged the obstacles that would be raised to the proposal but urged support for the petitioners' request. The committee's report was accompanied by a proposed bill entitled "An Act to Establish Free Schools." The bill required each town to establish and maintain at its own expense one or more free schools to serve white individuals between the ages of 6 and 20 who needed and applied for instruction in reading, writing, and common arithmetic. The Free School Act finally became law during March 1800.

However, passage of the 1800 act did not establish free schools throughout the state. All towns, with the exception of Providence and Smithfield, refused to implement fully its provisions. The law was repealed in 1803, but Providence, under Howland's leadership, continued to operate a system of free schools.

Agitation for a statewide system of free public schools continued. The "American and Gazette," a widely read newspaper of the day, in its January 11, 1828, edition noted the approach of the January session of the General Assembly and commented:

"Let free schools be established to the extent our present means will allow, and future generations will provide for preserving and enlarging the system. There is no instance in which a system of free schools, once fairly established, has been abandoned."

In due course,[8] the Legislature enacted the School Act of 1828. The first section of this act provided that the first $10,000 realized by the state treasury from the operations of the lotteries and fees attained from auctioneers should be set aside and paid to the various towns "for the exclusive purpose of keeping public schools and paying expenses thereof * * *." The town's share of this money was to be determined by consulting the federal census reports and seeing what portion of the town's population was under the age of 16. Control of the schools was vested in school committees rather than in town councils. The towns were not compelled to supplement the state's appropriation. More importantly, the act established a permanent fund for the support of the public schools and for that purpose appropriated $5,000 with the direction that the General Treasurer invest this sum "in the stock of some safe and responsible bank * * *." All lottery and auctioneer income over $10,000, as well as "all donations that may be made to said fund" were to be likewise invested. The permanent fund in actuality was a trust fund whose income could only be used if the payments made by the lottery entrepreneurs and the auctioneers failed to reach the $10,000 level. It should be noted that the emphasis of the 1828 legislation was on "public," rather than on "free," schools.

---

[8]Most of the pre-1828 events which I have related in this opinion can be found detailed in a thoroughly informative and interesting article published by the Rhode Island Historical Society in its publication *Rhode Island History*, Vol. 37:4 (November 1978). The article, which can be found at p. 111, is entitled "John Howland: Pioneer in the Free School Movement," and the author is Professor Francis X. Russo. The 1828 to 1841 events to which I have alluded, including the ups and downs of the permanent school fund, were extracted from *Public Education in Rhode Island* (1918), written by the late, distinguished Rhode Island educator, Dr. Charles Carroll. The description of the Dorr Rebellion facet of the narrative comes from Professor Patrick T. Conley's *Democracy in Decline*, a 1977 scholarly study of Rhode Island's constitutional development from 1776 to 1841.

Subsequent sessions of the General Assembly saw the introduction of several pieces of legislation where towns were seeking to gain better benefits from the 1828 act. A decade later, in 1839, the Legislature made a substantial revision in the legislation relating to public schools. The annual appropriation was raised to $25,000, income received on surplus federal funds deposited with the state pursuant to an act of Congress approved in June 1836 was also allocated to the support of the public schools, the permanent school fund was preserved, the powers of the school committee were more clearly defined, and municipalities were required to provide the Secretary of State with a variety of statistical information.

On October 4, 1841, the People's Convention under the leadership of Thomas W. Dorr met in Providence for the purpose of creating a new government to supplant the legally constituted state government, which at that time continued to operate under the terms of the Royal Charter. The most controversial of the much-needed reforms embodied in the resulting People's Constitution involved the extension of suffrage. The proposed constitution rejected the charter government's statutory requirement that in order to vote, a person had to be a "freeholder of lands, tenements, or hereditaments in such town where he shall be admitted free, of the value of [forty] pounds [ca. $134] * * * or the eldest son of such a freeholder." Suffrage under the People's Constitution was instead to be extended to all adult white male citizens with 1 year's residence in Rhode Island. The proposed constitution also contained specific directives for public education and "free schools"; its art. XII reached beyond the establishment of a permanent school fund and attempted to get within its grasp "[a]ll moneys which now are or may hereafter be appropriated by the authority of the state to public education * * *."

The surprising support accorded to Dorr's beliefs prompted the supporters of the regular government to act. Pursuant to a call given by the General Assembly, a Landholders' Convention met in November 1841, but adjourned

after partly drafting a document that essentially ignored reformers' demands. Under pressure of the recently but unofficially ratified People's Constitution, the landholders met again in February 1842 and adopted a proposed constitution whose art. XII contained a declaration that was as uncompromisingly supportive of public education as were the pronouncements made by the Dorrites.[9] In late March 1842, the document was the subject of a 3-day referendum and narrowly missed being ratified.

Dorr had been "elected" Governor under the provisions of the People's Constitution, and with the coming of spring came the Dorr Rebellion. Dorr's efforts to forcibly assume the prerogatives of his office began with his May 18, 1842 attempt to seize the Cranston Street arsenal in Providence. The seizure turned into a fiasco as Dorr's antiquated artillery refused to fire. Dorr fled the state but returned to Chepachet in late June to await the proposed July 4 reconvening of the People's General Assembly, but the tide was running against him. A call for another constitutional convention was issued. This third effort had substantial support from many individuals who embraced the principle of extending the right of suffrage but abhorred violence. They believed that voting reforms could be obtained through deliberations in the convention rather than an armed confrontation. On July 27, Dorr issued a order disbanding his undermanned and ill-supplied military force, and on the following day, July 28, militia loyal to the incumbent Governor stormed the insurgents' fortification on Chepachet's Acote's Hill. Dorr's war had ended.

With the approval by the electorate in November 1842 of the convention's proposal came the adoption of art. XII and the abolition of the lottery. Thus, even though the people had given constitutional status to the permanent school fund, they had at the same time dried up its most productive source of revenue.

---

[9]See Appendix.

Three additional historical comments are worth noting. One was made by the state auditor when in June 1874 he reported to the General Assembly about the events of the fiscal year that had ended on the previous April 30. At page 5 he referred to the balance in the permanent school fund, which was just in excess of $250,000, and reported that the income subject to investment contributed by the auctioneers amounted to $12,956. The auditor went on to say:

> "It is a question or subject matter deserving the attention of your honorable body, whether the best interests of the State, pecuniarily considered, would be enhanced by repealing all laws having reference to any farther reservation of the sum annually received from auctioneers to be added to this fund. The sum now appropriated annually for public schools is nearly five times as large as the accumulated dividends on this fund, and no good reason seems to now exist for a continuance of this practice or policy."

The auditor commented that, in light of the present state debt, good financial policy would seem to dictate that it would be prudent and economical to dispose of assets and investments of this nature.[10]

The Board of Education in its 1918 annual report to the General Assembly at pages 15 and 16 alluded to the permanent school fund and said that its yield was "so inconsiderable a part of the money annually appropriated for the support of public education that its income is practically a negligible element in computing school budgets."

Lastly, in 1922 the commission studying the question of financing public education also alluded to the permanent school fund and once again reported[11] that expenditures for

---

[10]Apparently, the auditor overlooked art. XII's directive that the permanent fund is a "perpetual fund." He was not alone because there were other times during the 1800's when, the constitution notwithstanding, moneys which should have been part of the fund were either spent or transferred to the general account.

[11]The Report of the Special Commission on Public School Finance and Administration, p. 11 (1922).

educational purposes "are being paid by appropriations from the general fund." The fund's income for that period was $11,301, and this sum was used to supplement the annual appropriation for "teachers' money."

It is my belief that art. XII embodies the state's constitutional commitment to support and foster public education exclusively. Many years ago Chief Justice Ames put the purpose of this article in its true focus when, as a single judge hearing an appeal from a decree of the Commissioner of Public Schools, he observed that the twelfth article of the constitution obligated the General Assembly "to diffuse knowledge and virtue amongst the people of the State by the promotion of public schools * * *." *Ammons* v. *School District No. 5*, 7 R.I. 596, 598 (1864). The permanent school fund called for by sec. 2 is still in existence. General Laws 1956 (1969 Reenactment) ch. 4 of title 16 relates specifically and solely to the custody and investment of the permanent school fund. Today the use of the income from the fund is dictated by the Board of Regents. However, it is obvious that when the framers and adopters considered art. XII, they never envisioned anything but school teachers and the basic three R's. They never thought there would come a day when school committees would be confronted with such things as student health programs, hot lunches, sports programs, and collective bargaining.

As time marched on, it has become obvious to all concerned that the income from the permanent school fund could never finance the state's responsibilities in the educational area. Nevertheless, the inadequacies that have developed afford no excuse for changing the immutable language of art. XII. The diversionary prohibition found in sec. 4, in my opinion, relates solely to the funds that do or should find their way into the permanent school fund and the income generated thereby pursuant to the provisions of what was sec. 8 of the 1828 enactment. The constitutional restriction refers to those funds and no others. While factfinding has no place in an advisory opinion, it is a pretty safe bet that whatever funds are being used to support the transportation

of pupils of the private regional schools come from sources other than the permanent school fund. In summary, while I concur with the negative responses given by the Chief Justice, my reasoning insofar as it relates to art. XII is somewhat different from his.

Appendix

People's Constitution

Declaration of Rights and Principles, No. 5.

The diffusion of knowledge, and the cultivation of a sound morality in the fear of God being of the first importance in a republican State, and indispensable to the maintenance of its liberty, it shall be an imperative duty of the Legislature to promote the establishment of free schools and to assist in the support of public education.

Article XII — Of Education — Sec. 1. All moneys which now are or may hereafter be appropriated by the authority of the state to public education shall be securely invested and remain a perpetual fund for the maintenance of free schools in this state; and the General Assembly shall be prohibited from diverting said moneys or fund from this use, and from borrowing, appropriating or using the same, or any part thereof for any purpose, or under any pretense whatsoever. But the income derived from said moneys or fund shall be annually paid over by the General Treasurer to the towns and cities of the state for the support of said schools, in equitable proportions; provided, however, that a portion of said income may, in the discretion of the General Assembly, be added to the principal of said fund.

Sec. 2. The several towns and cities shall faithfully devote their portions of said annual distribution to the support of free schools, and, in default thereof, shall forfeit their shares in the same to the increase of the fund.

Sec. 3. All charitable donations for the support of free schools and other purposes of public education shall be received by the General Assembly, and invested and applied agreeably to the forms prescribed by the donors, provided the

same be not inconsistent with the Constitution or with sound public policy, in which case the donation shall not be received.

Landholder's Constitution

Article XII — Of Education.

Sec. 1. The diffusion of knowledge, as well as of virtue, among the people being essential to the preservation of their rights and liberties, it shall be the duty of the General Assembly to promote public schools and to adopt all other means to secure to the people the advantages and opportunities of education which they may deem necessary and proper.

Sec. 2. The money which now is, or which hereafter may be appropriated by law for the formation of a permanent fund for the support of public schools shall be securely invested and remain a perpetual fund for that purpose.

Sec. 3. All donations for the support of public schools, or for other purposes of education which shall be received by the General Assembly shall be applied according to the terms prescribed by the donors.

Sec. 4. The General Assembly shall make all necessary provision by law for carrying this article into effect. They are prohibited from diverting said moneys or fund from the aforesaid uses, and from borrowing, appropriating or using the same, or any part thereof, under any pretense whatsoever.

*Revens, DeLuca & Najarian, Amato A. DeLuca,* for plaintiffs.

*Dennis J. Roberts II,* Attorney General, *John R. McDermott,* Special Assistant Attorney General, *Thomas W. Pearlman, David Hassenfeld,* Intervenors, *Joseph E. Marran, Jr.,* Intervenor, *Arnold E. Johnson,* Intervenor, for defendants.